# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| DAVID ROTH, On Behalf of Himself and All Others Similarly Situated, )<br><br>Plaintiff, )<br><br>vs. )<br><br>OFFICEMAX INC., CHRISTOPHER C. MILLIKEN, THEODORE CRUMLEY, GARY J. PETERSON, MICHAEL FEUER and GEORGE J. HARAD, )<br><br>Defendants. ) | No. 05-C-0236<br><br>Judge Gottschall<br>Magistrate Judge Denlow<br><br>**DEMAND FOR JURY TRIAL** |

**FILED**
JAN 31 2005
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## NOTICE OF FILING

PLEASE TAKE NOTICE that on Monday, January 31, 2005, we filed with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, 219 South Dearborn Street, Chicago, Illinois, the *Amended Complaint for Violation of the Federal Securities Laws*.

Dated:  January 31, 2005          By: _____

MARVIN A. MILLER
JENNIFER W. SPRENGEL
NYRAN ROSE PEARSON
**MILLER FAUCHER AND CAFFERTY LLP**
30 North LaSalle Street, Suite 3200
Chicago, Illinois  60602
(312) 782-4880

WILLIAM S. LERACH
MARK SOLOMON
X. JAY ALVAREZ
**LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP**
401 B Street, Suite 1600
San Diego, CA  92101
(619) 231-1058

- 1 -

SAMUEL H. RUDMAN
DAVID A. ROSENFELD
**LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP**
200 Broadhollow Road, Suite 406
Melville, NY 11747
(631) 367-7100

*Attorneys for Plaintiff*

DAVID ROTH, On Behalf of Himself and All Others Similarly Situated,

       Plaintiff,

  vs.

OFFICEMAX INC., CHRISTOPHER C. MILLIKEN, THEODORE CRUMLEY, GARY J. PETERSON, MICHAEL FEUER and GEORGE J. HARAD,

       Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 05-C-0236

Judge Gottschall
Magistrate Judge Denlow

**FILED**
JAN 3 1 2005
MICHAEL W DOBBINS
CLERK, U.S. DISTRICT COURT

**DEMAND FOR JURY TRIAL**

## AMENDED COMPLAINT FOR
## VIOLATION OF THE FEDERAL SECURITIES LAWS

### SUMMARY AND OVERVIEW

1.   This is a federal class action on behalf of those who purchased or otherwise acquired the publicly traded securities of OfficeMax Inc. ("OfficeMax" or the "Company"), between December 1, 2003 and January 11, 2005 (the "Class Period"), against OfficeMax and certain of its current and former officers and directors for violations of the Securities Exchange Act of 1934 (the "1934 Act").

2.   In July 2003, old-OfficeMax's founder and former Chairman and Chief Executive Officer, Michael Feuer ("Feuer"), and Boise Cascade Corporation's ("Boise") Chairman and Chief Executive Officer, George J. Harad ("Harad"), announced a $1.4 billion proposed acquisition of old-OfficeMax by Boise. Under the terms of the proposed sale, old-OfficeMax's shareholders would be paid the equivalent of $9.00 per share in newly issued Boise common stock and cash. Many of Boise's larger shareholders objected to the terms of the proposed sale, questioning the price being paid for OfficeMax, the amount of debt Boise would take on and the viability of the management

- 1 -

team that would be left to run the combined company. But pursuant to change-in-control agreements and other golden parachute arrangements defendants entered into in anticipation of the sale, Feuer, Harad and other executives would be able to cash-out upon consummation of sale, receiving tens of millions of dollars.

3.  Defendants sent an amended Proxy Statement to both companies' shareholders to approve the proposed sale on November 6, 2003. The Class Period begins on December 1, 2003. Between December 1, 2003 and December 9, 2003, when both companies' shareholders would vote on the proposed transaction, defendants issued false and misleading statements concerning OfficeMax's then-current financial performance and the combined company's expected financial performance in order to obtain shareholder approval of the proposed sale. The false statements had their intended effect, and on December 9, 2003, both companies' shareholders approved the sale of old-OfficeMax to Boise for $10.50 per share.

4.  Harad and others considered the acquisition of old-OfficeMax to be the first step in Boise's "transformation" from a forest products manufacturing company to a major retail distribution company. In October 2004, Boise would sell its remaining forest product assets, adopt the name "OfficeMax," and abandon its wood product manufacturing business segments in favor of its office supply retail business. Today, OfficeMax is a multinational contract and retail distributor of office supplies and paper, technology products and office furniture.

5.  On January 12, 2005, the Company shocked the market by issuing a press release entitled "OfficeMax Announces Resignation of CFO, Delays Earnings Release Pending Investigation and Reiterates Intent to Repurchase Common Shares." The press release stated in relevant part:

> OfficeMax ... announced today that Brian Anderson, executive vice president and chief financial officer, has resigned. Ted Crumley, the former chief financial officer of OfficeMax, will return to that position on an interim basis. The company has begun a search for a permanent replacement....

OfficeMax also announced that it will postpone the release of its earnings for the fourth quarter and full year 2004, pending the conclusion of its previously announced internal investigation into issues relating to its accounting for vendor income. The investigation is being conducted under the direction of the audit committee of OfficeMax's board of directors.

To date, the company's investigation has confirmed the claims by a vendor to its retail business that certain employees fabricated supporting documentation for approximately $3.3 million in claims billed to the vendor by OfficeMax during 2003 and 2004. As a result of information discovered in the course of its investigation, the company has expanded the scope of its investigation to include a review of the manner in which it recorded rebates and other payments from vendors for fiscal years 2003 and 2004. The issues involved in this aspect of the investigation principally involve the proper timing for the recognition of such payments. The company has terminated four employees, based on the information discovered through its investigation.

6.    During the Class Period, defendants made false and misleading statements regarding the Company's revenues and earnings in order first to induce shareholder approval of the acquisition of old-OfficeMax by both Boise's and old-OfficeMax's shareholders and then to inflate the Company's stock price in order to permit certain defendants to sell OfficeMax stock at inflated prices and to complete a $1.5 billion note placement. Defendants' statements had their intended effect and the sale was consummated, tens of millions of dollars in severance and change-in-control payments were paid to defendants, Company stock was sold at inflated prices and OfficeMax placed $1.5 billion worth of notes. The true facts, which were known by each of the defendants but concealed from the investing public during the Class Period, were as follows:

(a)    that for a period of at least two years, millions of dollars worth of the Company's sales were fraudulently booked as legitimate sales;

(b)    that the Company was using (and manipulating its use of) "vendor allowances"[1] in order to manipulate the Company's earnings and timing of revenue recognition;

---

[1]    Vendor allowances are monies paid by suppliers for promotions, prime shelf space, discounts and rebates.

(c) that the Company's Q4 2004 results and those beyond would be eroded by the Company's internal investigation costs and the halting of the Company's abusive vendor allowance scheme;

(d) that the Company lacked the necessary internal controls to insure all revenue reported complied with generally accepted accounting principles ("GAAP"); and

(e) that the Company had entered into a long-term paper supply contract with Boise Cascade, LLC – the Company's timber successor company – which, unbeknownst to investors, was not commensurate with the market rate.

## JURISDICTION AND VENUE

7. Jurisdiction is conferred by §27 of the 1934 Act. The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act and Rule 10b-5.

8. Venue is proper in this District pursuant to §27 of the 1934 Act. Many of the false and misleading statements were made in or issued from this District.

9. The Company's principal executive offices are in Itasca, Illinois, where the day-to-day operations of the Company are directed and managed.

## THE PARTIES

*Plaintiff*

10. David Roth purchased OfficeMax publicly traded securities as described in the attached certification and was damaged thereby.

*Defendants*

11. OfficeMax is a multinational contract and retail distributor of office supplies and paper, technology products and office furniture.

12. Christopher C. Milliken ("Milliken") is the President, CEO and a director of OfficeMax. Milken signed false and misleading SEC filings during the Class Period.

- 4 -

13. Theodore Crumley ("Crumley") is the CFO of OfficeMax. Crumley signed false and misleading SEC filings and Sarbanes-Oxley certifications during the Class Period.

14. Gary J. Peterson ("Peterson") served as President of OfficeMax's Retail Division until he was terminated on January 5, 2004. Peterson issued false and misleading statements concerning OfficeMax's operations during the Class Period.

15. Michael Feuer ("Feuer") founded old-OfficeMax in 1988 and served as its Chairman and CEO until OfficeMax was sold to Boise on December 9, 2003. Feuer signed the proxy statement to shareholders recommending approval of the acquisition of old-OfficeMax by Boise and issued positive statements about OfficeMax to induce approval of the sale during the Class Period.

16. George J. Harad ("Harad") is the Executive Chairman of the Board of OfficeMax, a capacity he has served in since relinquishing the Chief Executive position at Boise in October 2004 when Boise sold its forest product assets and changed its name to OfficeMax. Harad signed the proxy statement to shareholders recommending approval of the acquisition of old-OfficeMax by Boise and issued positive statements about both companies through the Class Period. Harad signed false and misleading SEC filings and Sarbanes-Oxley certifications.

17. The individuals named as defendants in ¶¶12-16 are referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of OfficeMax's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not to the public, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were

being concealed from the public and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein at ¶¶33-34, 36, 38-39, 41-42, 46-47, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SCIENTER

18.     In addition to the above-described involvement, each Individual Defendant had knowledge of OfficeMax's problems and was motivated to conceal such problems. Crumley, as CFO, was responsible for financial reporting and communications with the market. Many of the internal reports showing OfficeMax's forecasted and actual growth were prepared by the finance department under Crumley's direction. Defendant Milliken, as CEO and President, was responsible for the financial results and press releases issued by the Company. Defendant Peterson, as President of OfficeMax's Retail Division, participated in the falsification of the Company's financial results. Defendants Harad and Feuer, while serving as the CEOs and Chairmen of the Company's predecessors, were responsible for financial reporting and communications with the market. Each Individual Defendant sought to demonstrate that he could lead the Company successfully and generate the growth expected by the market.

19.     Defendants were motivated to engage in the fraudulent practices alleged herein in order to ensure shareholder approval of the sale of old-OfficeMax to Boise, to obtain financing for the Company and prove to the market the Company could operate profitably without its timber division.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

20.     Each defendant is liable for (i) making false statements, *or* (ii) failing to disclose adverse facts known to him about OfficeMax. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on those who purchased or otherwise acquired OfficeMax

publicly traded securities was a success, as it (i) deceived the investing public regarding OfficeMax's prospects and business; (ii) allowed defendants to obtain shareholder approval of Boise's acquisition of OfficeMax, triggering tens of millions of dollars in severance and related payments to themselves; (iii) artificially inflated the prices of OfficeMax's publicly traded securities; (iv) allowed defendants to arrange to sell $1.5 billion worth of OfficeMax notes at artificially inflated prices (with preferential interest rates to the Company); and (v) caused plaintiff and other members of the Class to purchase OfficeMax publicly traded securities at inflated prices.

## BACKGROUND

21.     ***Boise Cascade.***  Boise was incorporated under the laws of Delaware in 1931 under the name Boise Payette Lumber Company of Delaware, as a successor to an Idaho corporation formed in 1913.  In 1957, the company's name was changed to Boise Cascade Corporation.  Boise was also a major distributor of building materials and an integrated manufacturer and distributor of paper, packaging, and wood products.  In March 2004, Boise owned or controlled approximately 2.4 million acres of timberland in the United States.

22.     ***OfficeMax.***  In 1988, defendant Feuer founded OfficeMax, a chain of high-volume office products superstores.  In 1994, Feuer launched what was then the largest retail IPO, receiving $675 million in proceeds.  The proceeds from that offering, as well as those from the secondary offering in 1995, primarily went to buy out Kmart Corp.'s 92% stake in OfficeMax.  As of January 25, 2003, OfficeMax owned and operated 970 superstores in 49 states, Puerto Rico, the U.S. Virgin Islands and, through a majority-owned subsidiary, in Mexico.

23.     OfficeMax's IPO was the largest, but compared to the 1989 IPO of office supply chain pioneer Staples, which raised just $36 million, it was not the most profitable for shareholders. Returns for shareholders in the rival chains differed sharply.  OfficeMax shares traded flat for nine years after their debut, while Staples' shares rose nearly 500% over that same period.  By the end of

- 7 -

2001, OfficeMax was carrying a debt-load of at least $220 million. By the middle of 2002, OfficeMax had posted eight straight quarterly losses. By October 2002, OfficeMax's stock, which had traded as high as $20 per share in 1998, reached a 52-week low of $3.05. Feuer told the *Daily Deal* in April 2004 that he "knew a year and a half ago that we couldn't stay public."

24.     Feuer began discussing selling OfficeMax to paper products giant Boise. After several months of negotiations that stretched from OfficeMax's Ohio headquarters to the Sears Tower in Chicago to the French Riviera, Feuer and Harad agreed to terms. On July 14, 2003, Boise offered to purchase OfficeMax for 30% cash and 70% stock. The price closed at $10.50 per share. In November 2003, Institutional Shareholder Services urged Boise's shareholders to vote against the acquisition because of concerns about overpaying, taking on too much debt, and doubts about the inexperience of the ongoing management of the combined company. Additionally, some large Boise shareholders wanted to see the forest products company divest its timberlands or building products line before more than doubling the size of its existing office products unit. Harad adamantly defended the combined company's proposed management, but by late November 2003, Boise announced that once it closed its purchase of OfficeMax, it would exit both the paper and building products businesses. Goldman Sachs, who represented Boise in the acquisition of OfficeMax, was retained to sell the forest products assets.

25.     Boise consummated its acquisition of OfficeMax on December 9, 2003, for approximately $1.06 billion. Though having stated in July 2003 when the deal was announced that he had signed a five-year employment agreement with OfficeMax and planned to "hang around for the fun part," since he co-founded the company, on the same day the OfficeMax acquisition closed, Feuer announced he and Ralph Della Ratta, a former investment banker at KeyCorp's McDonald Investments Inc., had since established Max-Ventures, a venture capital firm focusing on specialty

retailing. McDonald Investments helped take OfficeMax public in its IPO and advised OfficeMax in its sale to Boise. Feuer signed a five-year consulting contract with OfficeMax.

26.     Boise Chairman and CEO Harad had been with Boise since 1971. Following the December 2003 consummation of Boise's acquisition of OfficeMax, Harad stepped down as CEO, assuming the Executive Chairman title of OfficeMax.

27.     In July 2004, the Company announced that the Chicago buyout firm of Madison Dearborn Partners LLC had agreed to buy its paper, forest products and timberland businesses for $3.7 billion, which included Boise's headquarters in Boise, its Boise Building Solutions unit, and 2.3 million acres of U.S. timberland, 35,000 acres of eucalyptus plantation land in Brazil and a 16,000-acre cottonwood fiber farm. The spun-off entity would be called Boise Cascade, LLC and the Company would rename itself "OfficeMax Inc." OfficeMax would keep a 19% ownership stake in Boise Cascade, LLC and would take back a timberland installment note. The Company would also continue purchasing paper from old-Boise for undisclosed terms, purchasing about 700,000 tons in 2004 alone.

28.     In October 2004, Boise completed the sale of its paper and timberland assets for $3.7 billion. Approximately $2.2 billion of the net proceeds went to pay down debt Boise took on buying OfficeMax.

29.     In November 2004, Boise adopted the "OfficeMax" name. Defendant Milliken, division president and chief executive of Boise Office Solutions, became President and CEO of OfficeMax.

30.     Harad, Feuer and the Company's other executives stood to gain substantially by completing the sale of OfficeMax to Boise:

        (a)     *Feuer.* Feuer would obtain about $60 million in severance and other cash payments upon closing of the sale. Feuer would also receive a consulting contract worth $1 million

- 9 -

a year for five years. On December 15, 2003, Feuer would cause the Company to register 542,469 shares of Boise common stock he received in the acquisition for resale.

(b) **Harad.** Though Harad would stay on as Executive Chairman of the combined company – at least temporarily – the completion of sale of the Company's forest products and paper assets and the transformation to OfficeMax on October 29, 2004 would satisfy the performance requirements for 260,300 shares of restricted stock the Board granted him in 2003, then worth just more than $8 million. Harad would also sign a new employment agreement with OfficeMax containing a substantial severance package on that same day. Pursuant to the new agreement, when Harad steps down as the Executive Chairman of OfficeMax in June 2005 he is guaranteed an incentive and severance package worth over $10 million:

      (i)       $1.32 million incentive bonus;

      (ii)       $1.5 million retention payment;

      (iii)       $7.26 million severance payment;

      (iv)       Paid office space and secretarial assistance in Boise for two years that cannot exceed $80,000 a year;

      (v)       Three years of continued eligibility in the Company's health, life, disability and accident insurance plans; and

      (vi)       A $5,000 per year financial counseling allowance for three years.

(c) **Other Executives.** OfficeMax entered into change-in-control employment agreements with each of its executive officers that provided each executive officer with millions of dollars worth of severance benefits if their employment with OfficeMax was terminated after the merger, and additional tax gross-up payments. All vested and unvested OfficeMax stock options would be cashed out for millions of dollars. Additionally, thousands of shares of restricted stock would prematurely vest upon consummation of the sale.

## DEFENDANTS' FALSE AND MISLEADING
## STATEMENTS ISSUED DURING THE CLASS PERIOD

31. On the morning of December 1, 2003, Feuer was interviewed by *Bloomberg News* which was broadcast by *Bloomberg*. Feuer reported that holiday sales were "fantastic," and that "sales increased an astounding almost 35 percent over last year." In an article following the interview and based on Feuer's statements to *Bloomberg*, *Bloomberg* reported that "OfficeMax Says 4th-Quarter Sales to Exceed Forecast." Those forecasts, as reported in the *Bloomberg* article, were earnings of $0.19 a share and sales of $1.4 billion in Q4 2003. The article also noted that OfficeMax's stock price had increased 18% since the sale to Boise was announced and that both companies' shareholders were scheduled to vote on the proposed transaction on December 9, 2003.

32. In the following days, Harad would report that Boise's projected debt for the purchase of OfficeMax was about $2.3 billion. Large Boise investors were concerned that the debt load would leave the combined company with a debt-to-equity ratio more than double that of its office products competitors Office Depot and Staples. The rising debt load would also lower the combined company's cash flow for other uses.

33. On December 9, 2003, OfficeMax's and Boise's shareholders agreed to the sale of OfficeMax to Boise at concurrent meetings. On December 9, 2003, Boise issued a press release, entitled "Boise Completes OfficeMax Acquisition for $1.3 Billion," which stated in relevant part:

> "Our acquisition of OfficeMax represents a major step in the transformation of Boise's office products distribution business and Boise as a whole," said George J. Harad, chairman and chief executive officer. "The combined office products business will be strategically stronger and better able to deliver compelling value to its customers through all channels and across all segments of the market."

> Christopher C. Milliken, division president and chief executive officer of Boise Office Solutions, said, "In combining our two complementary organizations, we will strive to be the leading provider of office products and services through a relentless focus on our customers. We will succeed by providing our customers with an unparalleled customer experience – in service, in product, in time savings, and in value."

"OfficeMax co-founder, Chairman, and CEO Michael Feuer deserves recognition for his leadership in building OfficeMax into the nation's third-largest office products retailer," Harad said. "His vision and skill helped to create the outstanding business we are acquiring today."

The acquisition of OfficeMax more than doubles the size of Boise Office Solutions to pro forma 2002 sales of $8.3 billion. Boise anticipates that synergy benefits from the acquisition will reach an annual amount of $160 million: $100 million in 2004, $150 million in 2005, and $160 million in 2006.

34.     On December 9, 2003, OfficeMax issued a press release, entitled "OfficeMax

Shareholders Approve and Adopt Agreement and Plan of Merger to Combine with Boise Cascade

Corporation," stating in relevant part:

OfficeMax Inc. today said its shareholders overwhelmingly approved and adopted the agreement and plan of merger to combine with Boise Cascade Corporation, *creating a new organization with "all-in" sales of over $12 billion*.

Michael Feuer, OfficeMax's co-founder, chairman and chief executive officer, said, "Shareholders of OfficeMax will receive a combination of cash and Boise stock approximating $1.4 billion, which represents a nearly 70 percent increase in the Company's stock price since last year on the same date."

OfficeMax said it expects the transaction to be completed by the end of business today, and, accordingly, shares of OfficeMax stock will cease to trade under the ticker symbol "OMX" on all securities markets.

35.     On January 22, 2004, the Company hosted a conference call to report the Company's

Q4 and FY 2003 financial results. The Company reported net income of $6.9 million, or $0.05 a

share, for the quarter that ended December 31, 2003, versus a profit of $6.2 million, or $0.05 a share

in Q4 2002. Revenue rose to $2.35 billion from $1.8 billion in Q4 2002. Excluding special items

and the net impact of the OfficeMax acquisition, the Company's net income was $18.3 million, or

$0.24 per diluted share. For 2003, Boise Cascade earned $8.3 million on revenues of $8.25 billion,

compared to $11.3 million on revenue of $7.4 billion in 2002. Based on what he then knew of the

Company's sales trends, Harad said both sales and income would likely rise during 2004 as office

product sales increased, prices strengthened for wood products and what he called a cyclical low in the paper industry ended.

36.     On March 2, 2004, the Company filed its Form 10-K for the fiscal year ended December 31, 2003. The 10-K was signed by defendants Harad as CEO and Crumley as CFO. In the 10-K, defendants claimed that they personally supervised the evaluation of the design and operation of the Company's disclosure procedures pursuant to Rule 13a-15(e), to ensure that the Company's controls would alert them to material information which would conflict with GAAP and/or require disclosure. Defendants affirmatively stated on March 2, 2004 that no such disclosure issues or control problems existed.

37.     On April 20, 2003, the Company hosted a conference call announcing Q1 2004 financial results. During the conference call, defendants explained that the $1.4 billion purchase of OfficeMax in December 2003 helped generate record sales of more than $3.5 billion for the quarter, compared to $2.3 billion in Q1 2003. Profits for the quarter were reported to be $63.5 million, or $0.66 a share, compared to a loss of $27.5 million, or $0.53 a share, reported in Q1 2003. Harad said the Company expected "significantly higher sales and income" for 2004. Harad said that the Company's troubled paper division was expected to return to a profit during Q2 2004. *During the quarter, the Company said it realized $12.6 million in integration synergies – cost savings associated with the OfficeMax purchase – and the Company remained on target to realize $80 million in savings by the end of 2004.*

38.     On May 7, 2004, the Company filed its Form 10-Q for the period ended March 30, 2004. The 10-Q was signed by Thomas E. Carlile as Vice President and Controller. In their Sarbanes-Oxley Certifications, defendants Harad and Crumley claimed that they personally supervised the evaluation of the design and operation of the Company's disclosure procedures pursuant to Rule 13a-15(e), to ensure that the Company's controls would alert them to material

- 13 -

information which would conflict with GAAP and/or require disclosure. Defendants Harad and Crumley also affirmatively stated on May 7, 2004 that no such disclosure issues or control problems existed.

39. On July 20, 2004, the Company released its Q2 2004 financial results, stating that a Canadian mill sale boosted its Q2 profits. The Company reported per-share earnings of $0.52 on revenues of $3.4 billion, boosted by higher sales of office products at OfficeMax. The reported results contrasted with a loss of $3.9 million, or $0.12 a share, on sales of $1.9 billion for Q2 2003.

40. On July 26, 2004, the defendants announced that Boise would sell off its forest products assets for $3.7 billion and change its name to OfficeMax.

41. On August 5, 2004, the Company filed its Form 10-Q for the period ended June 30, 2004. The 10-Q was signed by Thomas E. Carlile as Vice President and Controller. In the 10-Q, defendants Harad and Crumley claimed that they personally supervised the evaluation of the design and operation of the Company's disclosure procedures pursuant to Rule 13a-15(e), to ensure that the Company's controls would alert them to material information which would conflict with GAAP and/or require disclosure. Defendants Harad and Crumley affirmatively stated on August 5, 2004 that no such disclosure issues or control problems existed.

42. On November 9, 2004, the Company filed its Form 10-Q for the period ended September 30, 2004. The 10-Q was signed by defendants Milliken as CEO and Crumley as CFO. In the 10-Q, defendants claimed that they personally supervised the evaluation of the design and operation of the Company's disclosure procedures pursuant to Rule 13a-15(e), to ensure that the Company's controls would alert them to material information which would conflict with GAAP and/or require disclosure. Defendants affirmatively stated on November 9, 2004 that no such disclosure issues or control problems existed.

43.    On November 11, 2004, two days *after* the November 9, 2004 10-Q was filed, *Bloomberg* issued an article entitled "OfficeMax Hires Anderson as Chief Financial Officer." The article stated in part:

> OfficeMax, Inc., the office supply retailer that was acquired by Boise Cascade Corp. in December, named Brian Anderson chief financial officer and executive vice president of finance.

44.    Defendant Crumley immediately resigned as the Company was preparing to sell nearly $1.5 billion worth of OfficeMax debt.

45.    On December 17, 2004, *Bloomberg* issued an article entitled "OfficeMax Sells $1.47 Bln in Debt, Due October 2019." The article stated in part:

> OfficeMax Inc., the U.S. office-supply retailer acquired by Boise Cascade Corp., said it will sell $1.47 billion in debt.
>
> The debt, to be issued in two notes with interest rates of 5.42 percent and 5.54 percent, respectively, will be payable in October 2019, the Itasca, Illinois-based [sic] said in a filing with the U.S. Securities and Exchange Commission.
>
> The company also settled $1.47 billion in interest-rate swaps with Goldman Sachs Group Inc. unit J. Aron & Co. Dec. 16, paying $19 million to J. Aron, because of a decline in long-term interest rates, OfficeMax said in the filing.

46.    On December 20, 2004, the Company issued a press release entitled "OfficeMax Announces Financial Events, Commences Investigation." The press release stated in part:

> OfficeMax® Incorporated, a leader in office products and services, today announced monetization of the promissory notes received from the sale of its timberlands and the distribution of OMX common stock to holders of its Adjustable Conversion-Rate Equity Security (ACES) units. The company also announced it has commenced an investigation into certain vendor allegations, and that it is postponing a decision on the form and timing of equity repurchases until the investigation is complete.
>
> On October 29, 2004, OfficeMax closed the sale of its paper and forest products businesses. At that time, the company received $2.025 billion in cash for the assets sold, and an additional $15 million in cash and promissory notes of $1.635 billion for the timberlands portion of the sale. On December 21, 2004, the company will realize $1.470 billion in cash, before transaction expenses and related costs, from the monetization of those notes. In addition to $15 million received at closing and $1.470 billion realized from the monetization, the company will retain a residual interest in timber promissory notes of $165 million due in 2019.

On December 16, 2004, holders of OfficeMax's outstanding 7.50% equity security units received 5.41 million newly issued shares of OMX common stock in exchange for cash proceeds to OMX of $172.5 million. The settlement rate was 1.5689 shares of OMX common stock for each purchase contract forming a part of the $50 stated amount of each equity security unit. Following the conversion, OfficeMax has approximately 95 million fully diluted shares of common stock.

OfficeMax intends to use the proceeds from monetization of the timber promissory notes and conversion of the equity security units to continue its debt reduction program and to repurchase between $775 million and $815 million of its common stock. *However, at the direction of the audit committee of its board of directors, the company has commenced an internal investigation into claims by a vendor to its retail business that certain employees acted inappropriately in requesting promotional payments and in falsifying supporting documentation for approximately $3.3 million in claims billed to the vendor by OfficeMax during 2003 and 2004. Because the company's investigation has only recently begun, the company is postponing a decision as to the form and timing of share repurchases until the investigation is complete.*

47. On January 5, 2005, the Company issued a press release entitled "OfficeMax

Announces Peterson Resignation." The article stated in part:

OfficeMax® Incorporated, a leader in office products and services, today announced the resignation of Gary Peterson, president of the company's retail division, effective immediately. The company noted that the timing of Mr. Peterson's departure is unrelated to the company's current investigation into allegations of impropriety regarding vendor promotional payments.

48. On January 12, 2005, the Company issued a press release entitled "OfficeMax

Announces Resignation of CFO, Delays Earnings Release Pending Investigation and Reiterates

Intent to Repurchase Common Shares." The press release stated in relevant part:

OfficeMax ... announced today that Brian Anderson, executive vice president and chief financial officer, has resigned. Ted Crumley, the former chief financial officer of OfficeMax, will return to that position on an interim basis. The company has begun a search for a permanent replacement....

OfficeMax also announced that it will postpone the release of its earnings for the fourth quarter and full year 2004, pending the conclusion of its previously announced internal investigation into issues relating to its accounting for vendor income. The investigation is being conducted under the direction of the audit committee of OfficeMax's board of directors.

To date, the company's investigation has confirmed the claims by a vendor to its retail business that certain employees fabricated supporting documentation for

- 16 -

approximately $3.3 million in claims billed to the vendor by OfficeMax during 2003 and 2004. As a result of information discovered in the course of its investigation, the company has expanded the scope of its investigation to include a review of the manner in which it recorded rebates and other payments from vendors for fiscal years 2003 and 2004. The issues involved in this aspect of the investigation principally involve the proper timing for the recognition of such payments. The company has terminated four employees, based on the information discovered through its investigation.

49.     On January 12, 2005, *CBSMarketWatch* issued an article entitled "OfficeMax delays earnings report; CFO quits." The article stated in part:

Office Max Inc. said Wednesday it will postpone the release of its fourth-quarter and full-year earnings reports, pending the conclusion of a now-expanded probe into an accounting fraud.

\*     \*     \*

In addition, the company said Chief Financial Officer Brian Anderson resigned after two months on the job. Former CFO Ted Crumley will return to that post on an interim basis, the company said.

*OfficeMax, which first disclosed the investigation Dec. 20, said it has confirmed claims by a vendor that certain employees created false documents to support about $3.3 million in claims billed to a vendor in 2003 and 2004.*

*Four employees have been fired as a result of the investigation,* the company said.

OfficeMax spokesman Bill Bonner said the company could not reveal the name of the employees, or the vendor, as the investigation is still underway.

The Itasca, Ill.-based office products retailer said that *as a result of information discovered in its investigation, it has expanded the scope of the inquiry to include accounting procedures for rebates and other vendor payments in fiscal 2003 and 2004.*

OfficeMax said it expects to finish the probe by the third full-week of February, and intends to proceed with its previously stated share repurchase program once fiscal 2004 results have been reported.

50.     The true facts, which were known by each of the defendants but concealed from the investing public during the Class Period, were as follows:

(a)     that for a period of at least two years, millions of dollars worth of the Company's sales were fraudulently booked as legitimate sales;

- 17 -

(b)     that the Company was using (and manipulating its use of) "vendor allowances" in order to manipulate the Company's earnings and timing of revenue recognition;

(c)     that the Company's Q4 2004 results and those beyond would be eroded by the Company's internal investigation costs and the halting of the Company's abusive vendor allowance scheme;

(d)     that the Company lacked the necessary internal controls to insure all revenue reported complied with GAAP; and

(e)     that the Company had entered into a long-term paper supply contract with Boise Cascade, LLC – the Company's timber successor company – which, unbeknownst to investors, was not commensurate with the market rate.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5 Against All Defendants

51.     Plaintiff incorporates ¶¶1-50 by reference.

52.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

53.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchase or acquisition of OfficeMax publicly traded securities during the Class Period.

54.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for OfficeMax publicly traded securities. Plaintiff and the Class would not have purchased or acquired OfficeMax publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

55.     As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchase or acquisition of OfficeMax publicly traded securities during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

56.     Plaintiff incorporates ¶¶1-55 by reference.

57.     The Individual Defendants acted as controlling persons of OfficeMax within the meaning of §20(a) of the 1934 Act. By reason of their positions as officers and/or directors of OfficeMax, and their ownership of OfficeMax stock, the Individual Defendants had the power and authority to cause OfficeMax to engage in the wrongful conduct complained of herein. OfficeMax controlled each of the Individual Defendants and all of its employees. By reason of such conduct, the Individual Defendants and OfficeMax are liable pursuant to §20(a) of the 1934 Act.

## CLASS ACTION ALLEGATIONS

58.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired OfficeMax publicly

traded securities (the "Class") on the open market during the Class Period. Excluded from the Class are defendants.

59.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. OfficeMax had more than 88 million shares of stock outstanding, owned by hundreds if not thousands of persons.

60.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether the 1934 Act was violated by defendants;

(b)     Whether defendants omitted and/or misrepresented material facts;

(c)     Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether defendants knew or deliberately disregarded that their statements were false and misleading;

(e)     Whether the prices of OfficeMax's publicly traded securities were artificially inflated; and

(f)     The extent of damage sustained by Class members and the appropriate measure of damages.

61.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

62.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

63. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A. Declaring this action to be a proper class action pursuant to FRCP 23;

B. Awarding plaintiff and the members of the Class damages, including interest;

C. Awarding plaintiff reasonable costs, including attorneys' fees; and

D. Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: January 31, 2005            By: _____
                                        MARVIN A. MILLER
                                        JENNIFER W. SPRENGEL
                                        NYRAN ROSE PEARSON
                                        **MILLER FAUCHER AND CAFFERTY LLP**
                                        30 North LaSalle Street, Suite 3200
                                        Chicago, Illinois 60602
                                        (312) 782-4880

                                        WILLIAM S. LERACH
                                        MARK SOLOMON
                                        X. JAY ALVAREZ
                                        **LERACH COUGHLIN STOIA GELLER**
                                        **RUDMAN & ROBBINS LLP**
                                        401 B Street, Suite 1600
                                        San Diego, CA 92101
                                        (619) 231-1058

SAMUEL H. RUDMAN
DAVID A. ROSENFELD
**LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP**
200 Broadhollow Road, Suite 406
Melville, NY 11747
(631) 367-7100

*Attorneys for Plaintiff*

LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS, LLP
197 South Federal Highway, Suite 200
Boca Raton, FL 33432
(561) 750-3000
(561) 750-3364 Facsimile

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, __David Roth__ ("Plaintiff"), declares as to the claims asserted, or to be asserted, under the federal securities laws, that:

1.      Plaintiff has reviewed the __OfficeMax Inc.__ complaint and authorized its filing.

2.      Plaintiff did not purchase any common stock/securities that are the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

4.      The following includes all of Plaintiff's transactions during the Class Period specified in the complaint for the common stock/securities that are the subject of this action:

| SECURITY (Common Stock, Call, Put, Bonds) | TRANSACTION (Purchase, Sale) | QUANTITY | TRADE DATE | PRICE PER SHARE/SECURITY |
|---|---|---|---|---|
| OfficeMax (OMX) | Purchase | 150 | 12-9-04 | 31.15 |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

Please list additional transactions on a separate sheet if necessary.

5.      Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws within the past three years, unless otherwise stated in the space below:

Aon Corp., Taro Pharm.

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this __12__ day of __January__, 2005.

X __David Roth__
SIGNATURE