UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | |
|---|---|
| DAVID ROTH, On Behalf of Himself and All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> OFFICEMAX INC., et al., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) |

No. 05-C-0236 (Consolidated)

<u>CLASS ACTION</u>

Judge Gottschall
Magistrate Judge Denlow

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' OMNIBUS MOTION
TO DISMISS THE CONSOLIDATED COMPLAINT AND THE SUPPLEMENTAL
MEMORANDUMS BY DEFENDANTS HARAD, CRUMLEY, CARLILE, MILLIKEN,
PETERSON AND FEUER

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ....................................................................................................1

II.     STATEMENT OF FACTS ......................................................................................3

        A.      Background ...............................................................................................3

        B.      Defendants' False Statements and Omissions of Material Fact..............4

III.    LEGAL STANDARDS ..........................................................................................12

IV.     ARGUMENT .........................................................................................................13

        A.      Plaintiff Pleads Defendants' Scienter with More than Sufficient
                Particularity...........................................................................................13

                1.      The Complaint Details Each Defendant's Misstatement or
                        Omission of Material Fact ..........................................................15

                2.      Defendants' Material Violations of GAAP Support a Strong
                        Inference of Scienter ...................................................................17

                3.      Defendants' Senior Executive Positions and Their Oversight of
                        OfficeMax's Financial Reporting and Controls Supports an
                        Inference of Scienter ...................................................................20

                4.      Defendants' Extraordinary Bonuses and Other Compensation
                        Supports an Inference of Scienter ..............................................23

                5.      Defendants' Evaluation and Certification of OfficeMax's Financial
                        Statements and Disclosure Controls and Procedures Raises a
                        Strong Inference of Scienter .......................................................25

        B.      Defendant Feuer's Impeccably Timed Stock Registration Supports an
                Inference of Scienter .............................................................................28

        C.      The Complaint Alleges Defendants Harad and Feuer Made Knowingly
                False Statements and Omissions About OfficeMax's Financials and
                Deficient Controls.................................................................................30

        D.      The Complaint Alleges Defendant Peterson Engaged in a Scheme to
                Defraud OfficeMax Investors ...............................................................34

        E.      The Complaint Alleges Defendant Milliken Made Misstatements and
                Omissions of Material Fact....................................................................36

**Page**

    F.    Plaintiff Has the Requisite Standing and Adequately Pleads Loss
Causation Under the Supreme Court's Decision in *Dura* and Seventh
Circuit Standards.................................................................................38

    G.    The Complaint Properly Alleges Control Person Liability....................42

        1.    Plaintiff Adequately Alleges a Primary Violation.....................43

        2.    Plaintiff Adequately Pleads Control of OfficeMax's Operations by
Each Defendant.........................................................................43

        3.    Plaintiff Has Adequately Alleged Defendants' Power or Ability to
Control OfficeMax's Accounting Misconduct ..........................44

V.    CONCLUSION...............................................................................................46

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Asher v. Baxter Int'l Inc.*,
    377 F.3d 727 (7th Cir. 2004) ........................................................................33

*Basic Inc. v. Levinson*,
    485 U.S. 224, 99 L. Ed. 2d 194, 108 S. Ct. 978 (1988)....................................13

*Caremark, Inc. v. Coram Healthcare Corp.*,
    113 F.3d 645 (7th Cir. 1997) ...................................................................41, 42

*Chu v. Sabratek Corp.*,
    100 F. Supp. 2d 815 (N.D. Ill. 2000) ...............................................14, 15, 32

*Clark v. Tro Learning*,
    1998 U.S. Dist. LEXIS 7989 (N.D. Ill. May 20, 1998) ....................................33

*Conley v. Gibson*,
    355 U.S. 41, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)............................................12

*DH2, Inc. v. Athanassiades*,
    359 F. Supp. 2d 708 (N.D. Ill. 2005) ..........................................................45, 46

*Danis v. USN Commc'ns, Inc.*,
    73 F. Supp. 2d 923, 939 (N.D. Ill. 1999) .......................................................20

*Danis v. USN Commc'ns, Inc.*,
    189 F.R.D. 391, 399 (N.D. Ill. 1999).............................................................39

*Davis v. SPSS, Inc.*,
    385 F. Supp. 2d 697, 2005 U.S. Dist. LEXIS 9497 (N.D. Ill. 2005)...............15, 16, 17, 38

*DiLeo v. Ernst & Young*,
    901 F.2d 624 (7th Cir. 1990) ........................................................................12

*Eisenstadt v. Centel Corp.*,
    113 F.3d 738 (7th Cir. 1997) ........................................................................30

*Eminence Capital, L.L.C. v. Aspeon, Inc.*,
    316 F.3d 1048 (9th Cir. 2003) ......................................................................46

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
    270 F.3d 645 (8th Cir. 2001) ........................................................................23

**Page**

*Gaylinn v. 3Com Corp.*,
   185 F. Supp. 2d 1054 (N.D. Cal. 2000) ................................................................29

*Greebel v. FTP Software, Inc.*,
   194 F.3d 185 (1st. Cir. 1999) ..............................................................................29

*Hallberg v. Am. Agencies Gen. Agencies, Inc.*,
   2005 U.S. Dist. LEXIS 9663 (N.D. Ill. Mar. 8, 2005) ........................................24

*Harrison v. Dean Witter Reynolds, Inc.*,
   974 F.2d 873 (7th Cir. 1992) .........................................................................42, 46

*Hevesi v. Citigroup Inc.*,
   366 F.3d 70 (2d Cir. 2004) ..................................................................................38

*Higginbotham v. Baxter Int'l*,
   2005 U.S. Dist. LEXIS 12006 (N.D. Ill. May 25, 2005) .....................................20

*Howard v. Everex Sys.*,
   228 F.3d 1057 (9th Cir. 2000) .............................................................................25

*Howell v. Motorola, Inc.*,
   337 F. Supp. 2d 1079 (N.D. Ill. 2004) ................................................................43

*In re Anicom Inc. Sec. Litig.*,
   2001 U.S. Dist. LEXIS 6607 (N.D. Ill. May 18, 2001) ...........................14, 15, 33

*In re Cabletron Sys.*,
   311 F.3d 11 (1st Cir. 2002) ...........................................................................25, 28

*In re Daou Sys.*,
   411 F.3d 1006 (9th Cir. 2005) .............................................................................18

*In re Digi Int'l Inc. Sec. Litig.*,
   6 F. Supp. 2d 1089 (D. Minn. 1998) ....................................................................18

*In re First Merchs. Acceptance Corp. Sec. Litig.*,
   1998 U.S. Dist. LEXIS 17760 (N.D. Ill. Nov. 4, 1998) ......................................33

*In re First Union Corp. Sec. Litig.*,
   128 F. Supp. 2d 871 (W.D.N.C. 2001) ................................................................30

*In re Global Crossing, Ltd. Sec. Litig.*,
   313 F. Supp. 2d 189 (S.D.N.Y. 2003) .................................................................38

**Page**

*In re Guidant Corp. Sec. Litig.*,
  2004 U.S. Dist. LEXIS 22809 (S.D. Ind. Nov. 8, 2004) ...................................................32

*In re Initial Public Offering*,
  214 F.R.D. 117 (S.D.N.Y. 2002) .....................................................................................39

*In re Mercator Software, Inc., Sec. Litig.*,
  161 F. Supp. 2d 143 (D. Conn. 2001)...............................................................................36

*In re Metawave Commc'ns Corp. Sec. Litig.*,
  298 F. Supp. 2d 1056 (W.D. Wash. 2003).........................................................................23

*In re Motorola Sec. Litig.*,
  2004 U.S. Dist. LEXIS 16857 (N.D. Ill. Aug. 25, 2004) ...........................................13, 42

*In re NeoPharm, Inc. Sec. Litig.*,
  2003 U.S. Dist. LEXIS 1862 (N.D. Ill. Feb. 7, 2003) ............................................. *passim*

*In re Next Level Sys. Sec. Litig.*,
  1999 U.S. Dist. LEXIS 5653 (N.D. Ill. Mar. 31, 1999)........................................................30

*In re Newell Rubbermaid Sec. Litig.*,
  2000 U.S Dist. LEXIS 15190 (N.D. Ill. Oct. 4, 2000).........................................................32

*In re Sears, Roebuck & Co. Sec. Litig.*,
  291 F. Supp. 2d 722 (N.D. Ill. 2003) ..................................................................13, 21, 31

*In re Spiegel, Inc. Sec. Litig.*,
  382 F. Supp. 2d 989 (N.D. Ill. 2004) ........................................................................15, 18

*In re Sunbeam Sec. Litig.*,
  No. 98-8258-Civ.-Middlebrooks (S.D. Fla. Jan. 31, 2002) ...............................................18

*In re Time Warner Sec. Litig.*,
  9 F. 3d 259 (2d Cir. 1993).................................................................................................20

*In re Wellcare Mgmt. Group Sec. Litig.*,
  964 F. Supp. 632 (N.D.N.Y. 1997)....................................................................................23

*Johnson v. Tellabs, Inc.*,
  262 F. Supp. 2d 937 (N.D. Ill. 2003) ..................................................................12, 16, 20

**Page**

*Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*,
   2004 U.S. Dist. LEXIS 4659 (N.D. Ill. Mar. 22, 2004)....................................................34

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2005)....................................................41

*Lindelow v. Hill*,
   2001 U.S. Dist. LEXIS 10301 (N.D. Ill. July 20, 2001)................................. *passim*

*Napier v. Bruce*,
   2004 U.S. Dist. LEXIS 9772 (N.D. Ill. May 27, 2004)....................................................20

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003) ....................................................23

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)....................................................23

*Otto v. Variable Annuity Life Ins. Co.*,
   134 F.3d 841 (7th Cir. 1998) ....................................................13

*Press v. Chem. Inv. Servs. Corp.*,
   166 F.3d 529 (2d Cir. 1999)....................................................23

*Rehm v. Eagle Fin. Corp.*,
   954 F. Supp. 1246 (N.D. Ill. 1997) ....................................................22, 23, 34

*Riggs Partners, LLC v. Hub Group, Inc.*,
   2002 U.S. Dist. LEXIS 20649 (N.D. Ill. Oct. 25, 2002)....................................................14

*Roots P'ship v. Lands' End, Inc.*,
   965 F.2d 1411 (7th Cir. 1992) ....................................................13, 39

*SEC vs. System Software Assoc., Inc.*,
   145 F. Supp. 2d 954 (N.D. Ill. 2001) ....................................................14

*Searls v. Glasser*,
   64 F.3d 1061 (7th Cir. 1995) ....................................................32

*Selbst v. McDonald's Corp.*,
   2005 U.S. Dist. LEXIS 23093 (N.D. Ill. Sept. 21, 2005) ....................................................20, 24, 34

*Sidney S. Arst Co. v. Pipefitters Welfare Educ. Fund*,
   25 F.3d 417 (7th Cir. 1994) ....................................................12

**Page**

*Sutton v. Bernard*,
  2001 U.S. Dist. LEXIS 11610 (N.D. Ill. Aug. 6, 2001) .................................................33

*Tatz v. Nanophase Tech. Corp.*,
  2002 U.S. Dist. LEXIS 19467 (N.D. Ill. Oct. 9, 2002)...................................................33

*Triad Assocs., Inc., v. Chicago Hous. Auth.*,
  892 F. 2d 583 (7th Cir. 1989) ......................................................................................12

*Wafra Leasing Corp. 1999-A-1 v. Prime Capital Corp.*,
  192 F. Supp. 2d 852 (N.D. Ill. 2002) ...........................................................................43

*Zurich Capital Mkts., Inc. v. Coglianese*,
  332 F. Supp. 2d 1087 (N.D. Ill. 2004) ...................................................................42, 44

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
  §78j(b)...........................................................................................................43
  §78t(a)...........................................................................................................42
  §78u-4(b)........................................................................................................12
  §78u-4(b)(1)...............................................................................................12, 13
  §78u-4(b)(2)....................................................................................................13

17 C.F.R.
  10b-5......................................................................................................13, 38, 43
  §210.4-01(a)(1)................................................................................................18
  §210.10-01(a)..................................................................................................18

Federal Rules of Civil Procedure
  Rule 8(a).........................................................................................................44
  Rule 8(a)(2).....................................................................................................41
  Rule 9(b)......................................................................................................3, 12
  Rule 12(b)(6)...................................................................................................12
  Rule 23...........................................................................................................39

## I.    INTRODUCTION

On December 20, 2004, OfficeMax Inc. ("OfficeMax" or the "Company")[1] shocked investors by revealing an internal investigation into what defendants described as a vendor's claim that OfficeMax employees falsified documentation for $3.3 million in claims to that vendor for promotional payments during 2003 and 2004.  On January 12, 2005, OfficeMax confirmed its employees had fabricated $3.3 million in invoices and supporting documentation to this vendor during 2003 and 2004.  OfficeMax also disclosed that it had expanded its investigation to more broadly investigate OfficeMax's improper revenue recognition practices for vendor payments.  On February 14, 2005, OfficeMax confirmed "that certain rebates and other payments from vendors in 2004 were not recorded in the appropriate accounting periods."  ¶71.  Finally, on March 16, 2005, owing to its systematic financial manipulations of vendor rebates, OfficeMax restated it financials for the first three quarters of 2004, revising its previously reported income for its retail division.  OfficeMax also disclosed that its internal controls over financial reporting were ineffective from late 2003 throughout 2004.

Just prior to and during this internal investigation, defendants Milliken (CEO, President and director), Crumley (CFO), and Peterson (President, Retail Division) resigned from the Company.  OfficeMax also fired six non-executive employees and its replacement CFO (Anderson) quit after only two months on the job.  Shortly thereafter, OfficeMax restated its financials for the first, second and third quarter of 2004 after admitting that the filing contained material misstatements.  Defendants Harad, Crumley, Milliken and Carlile had previously certified and attested to the accuracy of the statements in these financials.  As for the Company's "internal controls," from late

---

[1]     For the sake of consistency and simplicity, throughout this motion, plaintiff will refer to the defendant Company as "OfficeMax" or the "Company," realizing that Boise Cascade acquired old-OfficeMax on December 9, 2003, and 10 months later, changed its name to OfficeMax, Inc., as it is known today.

2003 through 2004, defendants Harad, Milliken and Crumley certified that they had personally "supervised an evaluation of the design and operation of [the Company's] disclosure controls and procedures" and made certain such controls "were effective in bringing material information about the company to the attention of senior management." OfficeMax later admitted, these controls were not effective during this period and, as a result, the Company had to restate its financials for the first three quarters of 2004.

Plaintiff's Complaint describes each false and misleading statement by defendants. They include OfficeMax's SEC filings, which were signed by defendants and incorporates the admittedly false financials. Their false and misleading statements also include press releases issued by the officers and directors of OfficeMax that incorporated the false financials and omitted material facts concerning vendor accounting and disclosure control problems at OfficeMax. The Company's restatement of its prior financials proves that each of defendants' statements were false or misleading when issued. The materiality of these false statements is also undisputed because the Company admitted that its restatement materially impacted the Company's reported earnings for the first three quarters of 2004.

Thus, the only real issue raised by defendants' motions is whether plaintiff has adequately alleged defendants acted with scienter, *i.e.*, did the defendants' engage in conscious misbehavior or recklessness when making their false statements. Defendants Harad, Crumley, Carlile and Milliken either knowingly lied about their design, evaluation and the effective operation of OfficeMax's disclosure controls or they knowingly covered up problems discovered with vendor accounting during the relevant period. These false statements alone support a strong inference of scienter. Even more so when considered in totality with OfficeMax's GAAP violations and restatements (¶85), OfficeMax's own admissions and internal investigation (¶¶93, 95), defendants' senior executive positions and oversight responsibilities (¶¶15-22), defendants' large performance-based bonuses and

compensation (¶¶26-27), the suspicious timing and departure of three of OfficeMax's senior executives (¶¶63-64, 67, 69), defendants' perfectly timed notes and common stock offerings (¶¶65, 65) and a formal SEC investigation (¶46).

As plaintiff's Consolidated Complaint in Violation of the Federal Securities Laws (the "Complaint") in every respect satisfies the pleading requirements of the Securities Exchange Act of 1934 (the "1934 Act"), the Private Securities Litigation Reform Act of 1995 (the "PSLRA") and Fed. R. Civ. P. 9(b), defendants' motions should be denied.

## II.     STATEMENT OF FACTS

### A.     Background

In 1988, defendant Michael Feuer founded OfficeMax, a chain of high-volume office supply superstores. ¶30.[2] In 1994, Feuer took OfficeMax public, raising $675 million. OfficeMax shares traded flat for nine years after their debut, while Staples' shares rose nearly 500% over that same period. By the end of 2001, OfficeMax was carrying a debt-load of at least $220 million. ¶31. By the middle of 2002, OfficeMax had posted eight straight quarterly losses. *Id*. By October 2002, OfficeMax's stock, which had traded as high as $20 per share in 1998, reached a 52-week low of $3.05. Feuer later admitted that by this time he knew "we [OfficeMax] couldn't stay public." *Id*.

Boise Cascade Corporation ("Boise") was a major distributor of building materials and an integrated manufacturer and distributor of paper, packaging, and wood products. Boise owned and controlled millions of acres of timberland in the United States. ¶29. In July 2003, Boise announced the proposed acquisition of OfficeMax for $1.4 billion. ¶32. This acquisition was the first step in transforming Boise from a forest products and manufacturing company into a major retail distribution company. ¶4.

---

[2]     All paragraph references ("¶_") are to the Complaint filed on August 1, 2005.

A big part of defendants' merger strategy was to sell the combined company's manufacturing operations and expand its retail operations. ¶23. Thus, the success and future prospects of the Company's retail operations – including its 970 superstores – was a focus of defendants. *Id*. A key characteristic of the retail operations was extremely low operating margins. Because of competition in the office superstore industry, it was crucial to keep prices low. *Id*. This was problem further exacerbated by competition from other large retailers, including Wal-Mart and Costco. *Id*. Consequently, operating margins in the retail industry were frequently lower than 3% of sales. *Id*.

One important way retailers can improve (and manipulate) their margins is through the use of vendor credits, which vendors give retailers for various items, including levels of inventory purchases, advertising or for product placement. *Id*. Because of the relatively low margins, the amount of vendor credits could have a dramatic effect on margins. *Id*. For example, in the first quarter of 2004, OfficeMax reported operating income from the retail segment of just $24 million on sales of $1.22 billion. ¶24. Of the $24 million, $7.1 million (30%) came from defendants' illegal and untimely recording of vendor credits. *Id*. An additional portion of the operating income was likely generated from legitimate vendor credits. Thus, the amount and timing of vendor credits recorded each quarter was one of the most important business metrics defendants monitored. *Id*.

**B.      Defendants' False Statements and Omissions of Material Fact**

On December 1, 2003, while vendor credits were being manipulated to distort earnings, OfficeMax Chairman and CEO Michael Feuer told *Bloomberg News* that holiday sales were "fantastic," and that "sales increased an astounding almost 35 percent over last year." ¶47. Based on Feuer's statements, *Bloomberg* reported that "OfficeMax Says 4th-Quarter Sales to Exceed Forecast," which were earnings of $0.19 a share on sales of $1.4 billion. *Bloomberg* also noted that OfficeMax's stock price had increased 18% since the merger announcement. *Id*.

Boise CEO George Harad noted that the combined company's debt would be about $2.3 billion, leaving it with a debt-to-equity ratio more than twice that of its competitors, Office Depot and Staples. ¶48. On December 9, 2003, shareholders of both companies approved the sale of OfficeMax to Boise. Feuer stated, "[s]hareholders of OfficeMax will receive a combination of cash and Boise stock approximating $1.4 billion, which represents a nearly 70 percent increase in the Company's stock price since last year on the same date." ¶50.

On January 22, 2004, defendants announced the Company's 4Q 2003 and full year 2003 financial results. ¶51. Defendants stated, "[f]or 17 selling days in fourth quarter 2003, the segment [retail] recorded sales of $283 million, operating income of $6.1 million, and an operating margin of 2.2%." *Id*. Harad proclaimed that "Boise's sales and income should increase substantially in 2004" and "[w]ith the acquisition of OfficeMax, Boise Office Solutions will post sharply higher sales and operating income in 2004." *Id*.

On March 2, 2004, defendants filed the Company's SEC Form 10-K for fiscal year ended December 31, 2003. Defendants Harad, Crumley and Carlile signed the 10-K. The 10-K falsely stated:

> As of the end of the period covered by this report, [Harad and Crumley] directed and supervised an evaluation of the design and operation of our disclosure controls and procedures pursuant to Rule 13a-15(e) of the Securities Exchange Act of 1934. The evaluation was conducted to determine whether the company's disclosure controls and procedures were effective in bringing material information about the company to the attention of senior management. Based on that evaluation, our chief executive officer and chief financial officer concluded that the company's disclosure controls and procedures are effective in alerting them in a timely manner to material information that the company is required to disclose in its filings with the Securities and Exchange Commission.
>
> Since our evaluation, we have made no significant changes in the design or operation of our internal controls. Likewise, we have not taken corrective actions or made changes to other factors that could significantly affect the design or operation of these controls. On December 9, 2003, we completed our acquisition of OfficeMax, Inc. Based on our evaluation, we do not believe this acquisition or the integration of our two systems of internal control will negatively affect the design or operation of our overall internal controls.

¶52, 10-K filed 3/2/04.

On April 20, 2004, defendants announced the Company's 1Q 2004 financial results. Defendants stated, "Boise Office Solutions, Retail, reported operating income of $24.0 million and an operating margin of 2.0% in first quarter 2004." ¶54. Harad claimed "[f]or Boise overall, we continue to expect significantly higher sales and income for full year 2004, relative to 2003, both as the result of the acquisition of OfficeMax and strong or improving performance in all of our businesses." *Id*. Defendants also stated that "[e]ffective January 1, 2003, we adopted an accounting change for vendor allowances." and that "vendor allowances reside in inventory with the product and are recognized when the product is sold, changing the timing of our recognition of these items." *Id*.

On May 7, 2004, defendants filed the Company's 1Q 10-Q for the period ended March 30, 2004. Carlile signed the 10-Q. ¶55. The 10-Q stated that Harad and Crumley personally "supervised an evaluation of the design and operation of [the Company's] disclosure controls and procedures" to ensure the controls "were effective in bringing material information about the company to the attention of senior management." *Id*., 10-Q filed 5/7/04. Harad and Crumley "concluded that the Company's disclosure controls and procedures [were] effective in alerting them in a timely manner to material information that the company is required to disclose." 10-Q filed 5/7/04. Harad and Crumley also signed certifications attesting to the accuracy of the financial statements in the 10-Q and verifying the effectiveness of the Company's controls and procedures. ¶55.

The Company's 1Q 2004 financial results were viewed favorably by the market. In June 2004, the Company's stock would reach its class period high of more than $37.70 per share. ¶57.

On July 20, 2004, defendants announced the Company's 2Q 2004 financial results. Defendants stated "[t]he Retail segment reported an operating loss of $5.4 million in second quarter

2004, compared with income of $24.0 million in 1Q 2004 and an operating margin of (0.6)%, compared with 2.0% in first quarter 2004." ¶58. On August 5, 2004, defendants filed the Company's second-quarter 10-Q for the period ended June 30, 2004. Carlile signed the 10-Q. ¶60. The 10-Q stated that Harad and Crumley personally "supervised an evaluation of the design and operation of [the Company's] disclosure controls and procedures" to ensure the controls "were effective in bringing material information about the company to the attention of senior management." 10-Q filed 8/5/04. Harad and Crumley "concluded that the company's disclosure controls and procedures [were] effective in alerting them in a timely manner to material information that the company is required to disclose." *Id*. Harad and Crumley also signed certifications attesting to the accuracy of the financial statements in the 10-Q and verifying the effectiveness of the Company's controls and procedures. ¶60.

On October 19, 2004, defendants announced the Company's 3Q 2004 financial results, stating "[t]he Retail segment reported operating income of $25.1 million in third quarter 2004, compared with a loss of $5.4 million in second quarter 2004, and an operating margin of 2.2%, compared with (0.6)% in second quarter 2004." ¶61. On November 9, 2004, defendants filed the Company's third-quarter 10-Q for the period ended September 30, 2004. ¶62. Crumley signed the 10-Q. *Id*. The 10-Q stated that Milliken and Crumley personally "supervised an evaluation of the design and operation of [the Company's] disclosure controls and procedures" to ensure the controls "were effective in bringing material information about the company to the attention of senior management." 10-Q filed 11/9/04. Milliken and Crumley "concluded that the company's disclosure controls and procedures [were] effective in alerting them in a timely manner to material information that the company is required to disclose." *Id*. Milliken and Crumley also signed certifications attesting to the accuracy of the financial statements in the 10-Q and verifying the effectiveness of the Company's controls and procedures. ¶62.

Just two days after defendants filed their 3Q 10-Q, Crumley resigned as CFO. ¶64. The Company appointed Brian Anderson as CFO and executive vice president of finance. ¶63.

On December 16, 2004, holders of OfficeMax's outstanding 7.5% equity security units received 5.41 million newly issued shares of OMX common stock in exchange for cash proceeds to the Company of $172.5 million. ¶66. On December 17th, defendants announced the sale of $1.47 billion in debt by issuing two notes payable in October 2019. ¶65.

Three days later, on December 20, 2004, defendants disclosed their internal investigation into accounting irregularities at the Company. The press release stated in part:

> [A]t the direction of the audit committee of its board of directors, the company has commenced an internal investigation into claims by a vendor to its retail business that certain employees acted inappropriately in requesting promotional payments and in falsifying supporting documentation for approximately $3.3 million in claims billed to the vendor by OfficeMax during 2003 and 2004.

¶66.

On January 5, 2005, defendant Peterson announced his immediate resignation from his position as President of the Company's retail division. ¶67. A week later, on January 12, 2005, the Company's new CFO Anderson resigned after only two months on the job. ¶68. Defendants were forced to delay their filing of the Company's 4Q 2004 and full year 2004 financial results. *Id.* As to the status of the investigation, defendants stated:

> [T]he company's investigation has confirmed the claims by a vendor to its retail business that certain employees fabricated supporting documentation for approximately $3.3 million in claims billed to the vendor by OfficeMax during 2003 and 2004. As a result of information discovered in the course of its investigation, the company has expanded the scope of its investigation to include a review of the manner in which it recorded rebates and other payments from vendors for fiscal years 2003 and 2004. The issues involved in this aspect of the investigation principally involve the proper timing for the recognition of such payments. The company has terminated four employees, based on the information discovered through its investigation.

*Id.* After this disclosure, OfficeMax's stock declined to as low as $27.82 per share, on volume of over 7.7 million shares. ¶70.

- 8 -

While improperly recording vendor payments, OfficeMax was also denying legitimate rebates to its customers. ¶45. When defendants failed to act on customer complaints, the Ohio Attorney General took action. On January 14, 2005, the *Associated Press* ran a story stating:

> Attorney General Jim Petro sued office supply company OfficeMax Inc. on Friday, saying it responded to more than 100 customer complaints only after the state intervened. The suit, filed in Franklin County Common Pleas Court, accuses the company of unfair and deceptive business practices by failing to honor rain checks and rebate requests.

> \* \* \*

> "The continual pattern of complaints that we got showed us that they were not fixing the problem. They were only fixing the problem when we stepped in," attorney general spokeswoman Michelle Gatchell said.

*Id*.

A few weeks later, on February 14, 2005, while defendants' internal investigation was still underway, Milliken abruptly resigned from his CEO, President and director positions. ¶71. Milliken's "resignation" from both his officer and director roles just happened to coincide with new findings from defendants' internal investigation. *Id*. Defendants stated their internal investigation had now "determined that certain rebates and other payments from vendors in 2004 were not recorded in the appropriate accounting periods." *Id*. Defendants' findings confirmed that the illegal conduct went well beyond the fabrication of accounting documents for a single vendor. ¶¶66, 71, 72. Defendants warned investors "that its previously issued interim statements of operating results for those periods [1Q 2004 – 3Q 2004] should no longer be relied upon." ¶71. Defendants also fired two more employees as a result of their internal investigation. *Id*.

On March 1, 2005, defendants claimed to have completed their internal investigation. ¶72. Defendants stated that "the company expects to restate quarterly income for each of the first three fiscal quarters of 2004" and "OfficeMax believes that its financial statements as of and for the year ended December 31, 2003, were not materially impacted." *Id*. Again, defendants warned investors

"that its previously issued interim statements of operating results for those periods should no longer be relied upon." *Id.*

On March 14, 2005, defendants reported OfficeMax's 4Q 2004 financial results. The retail segment operating margin was a negative 1.5%, which was lower than prior years. ¶73. OfficeMax attributed the decline in profitability to weak sales but also to "lower vendor income." *Id.* Thus, OfficeMax's profitability had been adversely affected by its inability to manipulate vendor income as it did in late 2003 and the first three fiscal quarters of 2004. *Id.*

The final outcome of defendants' internal investigation is stated in OfficeMax's 2004 10-K, filed on March 16, 2005. The 10-K states:

> We have amended our Quarterly Reports on Form 10-Q for the quarterly periods in the fiscal year ended December 31, 2004. The purpose of the restatement is to correct the accounting for vendor income, after we determined that rebates and other payments from vendors in 2004 were not recorded in the appropriate accounting periods. As a result, income from continuing operations was overstated by approximately $7.1 million in the first quarter of 2004 and was understated by approximately $1.1 million and $1.7 million in the second and third quarters of 2004, respectively.

¶85.

Defendants admitted to improperly recording vendor income in the first, second and third quarters of 2004, thus misstating OfficeMax's financial results for those periods. ¶78. Defendants restated those financial results to remove over $7 million in improperly reported income in violation of Generally Accepted Accounting Principles ("GAAP") and SEC rules. ¶39. The Company's 1Q-3Q 2004 financial results were included in Form 10-Qs defendants filed with the SEC and press releases defendants disseminated to the public. ¶77. While the Company did not formally restate its 4Q 2003 financial results, it has offered only, and less than convincingly, that it "*believes*" these 2003 vendor accounting manipulations, the occurrence of which they *admit*, were not "material" to the results for the *year ended* December 31, 2003. ¶39.

Plaintiff's investigation yielded additional facts about defendants' accounting manipulations of vendor income. OfficeMax recognized vendor incomes even though collection was highly unlikely. ¶41. Further, OfficeMax improperly took the same deductions from vendor invoices twice, essentially "double dipping." ¶42. OfficeMax's various vendors had certain "profiles" which would be used to calculate the amount of vendor promotions to be deducted from payments to the vendors. *Id*. After the merger, many vendors tightened up their vendor promotion policies which would have resulted in much lower income for OfficeMax. *Id*. To inflate its income, OfficeMax did not use the updated policies in their vendor profiles but continued to use the old profiles resulting in improper vendor allowances being deducted from payments to vendors. *Id*.

Another method OfficeMax used to inflate income was to take deductions based on inventory that had been returned to the vendor for which OfficeMax was already receiving a credit. ¶42. As expected, vendors would complain about the improper deductions taken from OfficeMax's payments to them. ¶43. OfficeMax's strategy to handle the complaints was to delay answering the complaints as long as possible. *Id*. The vendor calls went to the Accounts Payable department at OfficeMax but Accounts Payable could not answer the questions since accounts payable had not calculated the deductions and Accounts Payable was not allowed to forward the vendor calls to those who had calculated the deductions. *Id*. Those who calculated the deductions, the Vendor Income Planning and Analysis ("VIPA") group, were often unresponsive to vendor complaints. VIPA, in addition to double dipping, would also pre-date the deductions, or record the deductions as much as two months before OfficeMax had earned them. *Id*. Some vendors were so angry with these practices, they put OfficeMax on credit hold, and others even went to OfficeMax's offices to get the monies OfficeMax had not paid them. ¶44. Ultimately, vendor complaints made it impossible for OfficeMax's scheme to continue. *Id*.

On June 14, 2005, defendants disclosed the SEC had issued "a formal order of investigation arising from the company's previously-announced internal investigation into its accounting for vendor income." ¶46. The SEC's formal investigation is ongoing.

## III.   LEGAL STANDARDS

The purpose of a motion to dismiss is "to test the legal sufficiency of a complaint, not the merits of the case." *Johnson v. Tellabs, Inc.,* 262 F. Supp. 2d 937, 944 (N.D. Ill. 2003) (citing *Triad Assocs., Inc., v. Chicago Hous. Auth.,* 892 F. 2d 583, 586 (7th Cir. 1989)). In deciding a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the court must assume the truth of all well-pleaded allegations, making all inferences in the plaintiff's favor. *Sidney S. Arst Co. v. Pipefitters Welfare Educ. Fund*, 25 F.3d 417, 420 (7th Cir. 1994). Factual disputes unrelated to the sufficiency of the pleadings are improper on a motion to dismiss. *Johnson*, 262 F. Supp. 2d at 944. The court should dismiss a claim only if it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957).

To satisfy Fed. R. Civ. P. 9(b), a complaint must plead fraud claims with particularity, providing the circumstances of the claim – "the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). In addition, private securities fraud claims brought under the 1934 Act must meet the requirements of the PSLRA. 15 U.S.C. §78u-4(b). The PSLRA requires the complaint to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Id.* §78u-4(b)(1). Further, under the PSLRA, the complaint must "state with particularity facts giving rise to a strong inference that

the defendant acted with the required state of mind" with respect to each misleading statement or omission alleged. *Id*. §78u-4(b)(2).

## IV.    ARGUMENT

To allege a violation of §10(b) of the 1934 Act, a plaintiff must plead: (1) defendants made a false representation of material fact or omitted to disclose material information; (2) defendants acted with scienter; and (3) plaintiff's reliance on the defendants' false statements or omissions caused the alleged injury. *Otto v. Variable Annuity Life Ins. Co*., 134 F.3d 841, 851 (7th Cir. 1998). Plaintiff's reliance on defendants' statements or omissions is presumed under the fraud-on-the-market theory. Courts apply this presumption in a Rule 10b-5 action because an investor buys stock in reliance on the integrity of the market price, which reflects all publicly available information. *Basic Inc. v. Levinson*, 485 U.S. 224, 247, 99 L. Ed. 2d 194, 108 S. Ct. 978 (1988); *Roots P'ship v. Lands' End, Inc*., 965 F.2d 1411, 1416 n.4 (7th Cir. 1992).

### A.    Plaintiff Pleads Defendants' Scienter with More than Sufficient Particularity

The PSLRA requires a plaintiff to plead facts giving rise to a "strong inference" of scienter. 15 U.S.C. §78u-4(b)(2). While the Seventh Circuit has not commented on this pleading requirement, courts in this District and throughout the Circuit have adopted the standard articulated by the Second Circuit which permits the pleading of scienter with facts showing: (1) the defendant's motive and opportunity to commit fraud; or (2) circumstantial evidence of knowing misconduct or recklessness. *See*, *e.g.*, *In re Sears, Roebuck & Co. Sec. Litig*., 291 F. Supp. 2d 722, 726 (N.D. Ill. 2003); *In re Motorola Sec. Litig*., No. 03 C 287, 2004 U.S. Dist. LEXIS 16857, at *88 (N.D. Ill. Aug. 25, 2004); *In re NeoPharm, Inc. Sec. Litig.,* No. 02 C 2976, 2003 U.S. Dist. LEXIS 1862, at *42 (N.D. Ill. Feb. 7, 2003). To determine whether plaintiff's allegations raise a strong inference of scienter, "'a court

should not consider each relevant factual allegation solely in isolation . . . but rather, as a part of the overall factual picture painted by the complaint.'"[3] *Riggs Partners, LLC v. Hub Group, Inc.,* No. 02 C 1188, 2002 U.S. Dist. LEXIS 20649, at *14 (N.D. Ill. Oct. 25, 2002); *see also Chu v. Sabratek Corp.*, 100 F. Supp. 2d 815, 823 (N.D. Ill. 2000) ("The types of facts with which a plaintiff pleads scienter factor little into our analysis, as long [as] the overall facts give rise to 'a strong inference' of scienter."). Reckless disregard of the truth also constitutes scienter. *SEC vs. System Software Assoc., Inc.*, 145 F. Supp. 2d 954, 957 (N.D. Ill. 2001).

Defendants' GAAP violations and the Company's restatement of its first, second and third quarter financials for 2004 is evidence of fraudulent intent sufficient to support a strong inference of scienter. *In re Anicom Inc. Sec. Litig.*, No. 00 C 4391, 2001 U.S. Dist. LEXIS 6607, at *15-16 (N.D. Ill. May 18, 2001) (allegations of GAAP violations, including the need for financial restatements, "raise a strong inference that the defendants knew or recklessly disregarded that [the company] was disseminating incorrect information and . . . having financial difficulties"). Plaintiff's GAAP and restatement allegations are further bolstered by additional facts that give rise to a strong inference of scienter. The timing and nature of the "resignations" of Milliken, Crumley and Peterson after discovery of the misconduct are highly suggestive of their involvement in the scheme. ¶87. Each defendant also had strong financial motives to obtain extraordinary bonuses, severance and change-in-control payments for the perceived success of the merger and the Company in 2004. ¶25. Defendants were also motivated to obtain shareholder approval of the merger (¶25), announce the sale of $1.47 billion of debt financing through a note offering (¶65), and use its inflated stock price to issue 5.41 million shares of OfficeMax common stock to holders of OfficeMax's 7.50% equity security units and obtain a $172.5 million in cash as part of this offering. ¶66.

---

[3]      All citations and footnotes have been omitted and emphasis added unless otherwise noted.

1.    **The Complaint Details Each Defendant's Misstatement or Omission of Material Fact**

Defendants' Omnibus motion utterly confuses the issue of "group pleading." Defendants argue that plaintiff's Complaint improperly uses group pleading to "tie *every* Individual Defendant to *every* purported false statement." Omnibus Memorandum in Support of Defendants' Joint Motion to Dismiss the Consolidated Complaint ("*Omnibus* Mot.") at 11. This gross overstatement is false. In support, defendants conclusively cite to cases holding that group pleading is improper to prove defendants' *scienter*. *See Omnibus* Mot. at 12. There is a critical distinction between using group publication to allege misstatements and omissions and using group pleading to allege scienter. The latter is generally impermissible and not at issue here. *See Chu*, 100 F. Supp. 2d at 837 (rejecting group pleading "[t]o the extent the plaintiffs plead scienter based exclusively on an individual defendant's position in [the company's] hierarchy"). Defendants' motion fails to recognize this distinction and its conclusory discussion of group pleading hopelessly confuses these two issues.

Group publication "'creates the presumption that senior executives of a corporation may be held liable for misrepresentations or omissions contained in public statements that are attributable to or issued by a corporation.'" *Davis v. SPSS, Inc.,* 385 F. Supp. 2d 697, 2005 U.S. Dist. LEXIS 9497, at *21 (N.D. Ill. 2005). A reasonable presumption since a corporation only acts through its senior officers and directors. Courts in this district have followed this reasonable presumption. *See In re Spiegel, Inc. Sec. Litig.*, 382 F. Supp. 2d 989, 1019 (N.D. Ill. 2004) (group pleading allowed where plaintiffs alleged defendants were "intimately involved with, and had significant control over, [the company's] operations and specific disclosures (or nondisclosures)"); *Lindelow v. Hill*, No. 00 C 3727, 2001 U.S. Dist. LEXIS 10301, at *25 (N.D. Ill. July 20, 2001) (group pleading applies to corporate officers with respect to statements concerning critical business operations).

In *Davis*, the Honorable Judge Moran refused to dismiss a complaint on defendants' group pleading objection because:

- 15 -

> Though plaintiff refers to [] defendants as a group throughout his complaint, this does not warrant dismissal. Unlike in *Johnson*, plaintiff has stated facts that create an inference that the individual defendants played a role in the issuance of the relevant statements. Plaintiff alleges that all of the SEC filings were signed by both [CEO] and [CFO]. Furthermore, all the press releases contained comments by one of the men on the earnings results. These facts provide more than just their titles of chief executive officer and chief financial officer to link them to the financial statements.

*Davis*, 2005 U.S. Dist. LEXIS 9497, at *22. Like *Davis*, plaintiff's occasional reference to actions by "defendants" or "individual defendants" does not raise concerns of impermissible group pleading. *Id*. Here, the complaint does allege that defendants ran the Company as a group of executives. Apparently, defendants contest this.

The Complaint identifies the individual defendants who signed the false SEC filings and who personally certified the accuracy of the Company's financial statements and accounting controls. For instance, Harad, as CEO, along with Crumley and Carlile, in their respective CFO and Controller positions, signed the Form 10-K for fiscal year ended December 31, 2003. ¶52. These same three defendants, in their accompanying Sarbanes-Oxley certifications, claimed that they personally evaluated the design and operation of OfficeMax's disclosure controls and procedures. *Id*. Defendant Carlile, as Controller, signed the 1Q 2004 10-Q for the period ended March 31, 2004. ¶55. Further, Harad and Crumley claimed to have personally evaluated OfficeMax's disclosure controls and procedures during this period. ¶55. These same three defendants signed the 2Q 2004 10-Q for the period ended June 30, 2004. ¶60. Once again, Harad and Crumley certified the effectiveness of OfficeMax's controls and procedures in this filing. *Id*. Defendant Milliken, as CEO, along with Crumley, signed and certified the 3Q 2004 10-Q for the period ended September 30, 2004. ¶62. Milliken and Crumley also certified the effectiveness of the Company's controls and procedures in the 10-Q. *Id*. The Company has since admitted these statements were false when made.

The Complaint also identifies the individual defendants who made other false statements, including press releases that contained the false financials and material omissions. For instance, defendant Feuer made statements to *Bloomberg News* on December 1, 2003, claiming that holiday sales were "fantastic" and the Company had "astounding" increases in sales over the past year. ¶47. Further, in a December 9, 2003 OfficeMax press release, defendants Harad and Milliken touted the benefits of Boise's acquisition of OfficeMax. ¶49. The same day, defendant Feuer, in an OfficeMax press release, described how shareholders would benefit from the merger. ¶50. While boasting about merger benefits and astounding increases in sales, these defendants knew of and failed to disclose material problems with OfficeMax's accounting for vendor income.

On January 22, 2004, the Company issued another press release announcing its fourth quarter and full year 2003 results. ¶51. In this press release, Harad proclaimed that "Boise's sales and income should increase substantially in 2004" and "[w]ith the acquisition of OfficeMax, Boise Office Solutions [the retain division] will post sharply higher sales and operating income in 2004." *Id*. On April 20, 2004, the Company issued a press release announcing its first quarter 2004 financial results. ¶54. In it, Defendant Harad stated that "we continue to expect significantly higher sales and income for full year 2004, relative to 2003, both as the result of the acquisition of OfficeMax and strong or improving performance in all of our businesses." *Id*.

Where possible, plaintiff has identified the specific defendants engaged in the wrongdoing. The fact defendants worked together and jointly published certain press releases is not a defense to securities fraud. As the Court recognized in *Davis*, plaintiff's allegations are sufficient to meet the heightened pleading requirements of the PSLRA.

> ## 2. Defendants' Material Violations of GAAP Support a Strong Inference of Scienter

Plaintiff's allegations of accounting manipulations and false financial reports are further evidence of defendants' knowing or reckless misconduct. GAAP are those principles recognized by

the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X states that financial statements (including interim reports) filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. *See* 17 C.F.R. §210.4-01(a)(1); 17 C.F.R. §210.10-01(a).

It is well-settled that violations of GAAP, especially when coupled with other evidence of fraud, create a strong inference of scienter. *Spiegel*, 382 F. Supp. 2d at 1020 (GAAP violations coupled with awareness of "red flags" and defendants "access to information about the company's financial practices" gave rise to a strong inference of scienter.); *see also In re Daou Sys*., 411 F.3d 1006, 1022 (9th Cir. 2005) ("significant violations of GAAP standards can provide evidence of scienter"); *In re Digi Int'l Inc. Sec. Litig*., 6 F. Supp. 2d 1089, 1097 (D. Minn. 1998), *aff'd*, 14 Fed. Appx. 714 (8th Cir. 2001) (accounting manipulations combined with defendants' "failure to disclose other facts regarding [the company's] business," and individual defendants' positions of control and responsibility for public disclosures, constituted strong circumstantial evidence of conscious misbehavior). In SEC enforcement actions involving restated financials, the government often finds the persons responsible for the improper accounting acted with scienter:

> [T]he Commission often seeks to enter into evidence restated financial statements, and the documentation behind those restatements, in its securities fraud enforcement actions in order, inter alia, to prove the falsity and materiality of the original financial statements [and] to demonstrate that persons responsible for the original misstatements acted with scienter . . . .

*In re Sunbeam Sec. Litig*., No. 98-8258-Civ.-Middlebrooks, Brief of the United States Securities and Exchange Commission as *Amicus Curiae* Regarding Defendants' Motions *In Limine* to Exclude Evidence of the Restatement and Restatement Report (S.D. Fla. filed Jan. 31, 2002).

Plaintiff does not merely ***allege*** GAAP violations. Through its restatement, defendants have admitted to violating GAAP and that these violations were material to OfficeMax's financial results.

During the class period, OfficeMax improperly recognized income from vendors even though the conditions required by GAAP did not exist.  ¶82.  Specifically, the Company recognized vendor incomes even though collection was not probable.  *Id*.  OfficeMax received money from vendors to feature the supplier's products in ads and circulars.  *Id*.  Frequently, an OfficeMax newspaper advertisement for a certain brand of product was paid for in part by the vendor of that brand.  *Id*.  By overstating the expected amount of such compensation, OfficeMax was able to manipulate its reported results.

Pursuant to GAAP, the type of restatement announced by OfficeMax was to correct for material errors in its previously issued financial statements.  As noted by the SEC, GAAP only allows a restatement of prior financial statements based upon information "that existed at the time the financial statements were prepared," and "restatements should not be used to make any adjustments to take into account subsequent information that did not and could not have existed at the time the original financial statements were prepared.  *Sunbeam*, No. 98-8258-Civ. – Middlebrooks.  OfficeMax's restatement of its financial statements for the first, second and third quarter of 2004 is an admission that:  (i) its financial statements originally issued were materially false and misleading; and (ii) its financial statements reported during the class period were incorrect based on information available to defendants at the time the results were originally reported.  Proper revenue recognition is a fundamental accounting practice, the violation of which further supports the already strong inference of scienter pled in plaintiff's complaint.  *See*, *e.g*., *In re MicroStrategy Inc. Sec. Litig*., 115 F. Supp. 2d 620, 638 (E.D. Vir. 2000) ("violations of simple rules are obvious, and an inference of scienter becomes more probable as the violations become more obvious").  Here, defendants' material violations of GAAP support finding a strong inference of scienter.

### 3. Defendants' Senior Executive Positions and Their Oversight of OfficeMax's Financial Reporting and Controls Supports an Inference of Scienter

Contrary to defendants' claims, plaintiff does not allege scienter based solely on defendants' corporate positions at OfficeMax. Instead, defendants' senior executive positions and admitted oversight of and involvement with OfficeMax's financial reporting and disclosure controls during the relevant period establishes a presumption that defendants knew of the fraud. It also demonstrates defendants' opportunity to commit fraud. Defendants' defense to scienter – essentially that they had their heads hopelessly buried in the sand – is dishonest and contradicts their own admissions as to their personal involvement in these matters, as well as the Complaint's allegations and their positions as the most senior executives of OfficeMax.

Defendants were the top senior executives at OfficeMax and as such, are presumed to know about the financial affairs of the Company. Opportunity may be presumed for high-level officers with access to inside information. *In re Time Warner Sec. Litig.*, 9 F. 3d 259, 269 (2d Cir. 1993). In *Selbst v. McDonald's Corp.*, No. 04 C 2422, 2005 U.S. Dist. LEXIS 23093, at *61 (N.D. Ill. Sept. 21, 2005), the court found that "[h]igh-level [] managers . . . may be presumed to have been aware of [] problems" at their company." *Id.* at 61. Further, "[s]uch a presumption is particularly strong where the specific problem facing the company: (1) affects "a significant source of income" or a "core [business] operation"; or (2) would be "readily recognized by an outsider." *Id.* (citing *Danis v. USN Commc'ns, Inc.*, 73 F. Supp. 2d 923, 939 (N.D. Ill. 1999)).[4] As alleged in the Complaint and

---

[4]    Defendants' cases are distinguishable because in each instance, plaintiff made conclusory allegations of scienter based only on defendants positions within the Company. *See Napier v. Bruce*, No. 02 C 8319, 2004 U.S. Dist. LEXIS 9772, at *24 (N.D. Ill. May 27, 2004) (position as CEO not enough to raise a strong inference of scienter where not coupled with specific imputations of knowledge); *Johnson*, 262 F. Supp. 2d, at 967 (finding that plaintiffs' allegations of scienter resting on defendants' positions within the company were insufficient). Plaintiff notes the *Higginbotham v. Baxter Int'l*, No. 04 C 4909, 2005 U.S. Dist. LEXIS 12006 (N.D. Ill. May 25, 2005) case cited by defendants has since been vacated.

discussed below, defendants were the most senior executives of OfficeMax and vendor income was a significant source of income for OfficeMax's retail operations.  ¶24.

The success and future prospects of OfficeMax retail operations was a focal point of the defendants.  ¶23.  Their strategy all along being to get the shareholders to approve the merger of OfficeMax and Boise, sell the manufacturing operations and then expand the retail operations.  *Id*. Due to competition in the office superstore industry, it was crucial to keep prices low and one important way retailers can improve their margins is through the use of vendor credits.  *Id*.  Because of the relatively low operating margins, the amount of vendor credits could have a dramatic effect on margins.  *Id*.  Vendors of OfficeMax expressed dissatisfaction – ***to the point of anger*** – about the improper deductions OfficeMax had taken from their payments.  ¶43.  So much so that, many vendors placed OfficeMax on credit hold and others even went to OfficeMax's offices to get the monies OfficeMax had not paid them.  ¶44.

In *Sears*, plaintiffs alleged that defendants high-level positions within the Company led to a strong inference they knew non-public information about Sears, including information that made many of the alleged statements false and misleading.  291 F. Supp. 2d at 727.  The court held that, "[o]fficers of a company can be assumed to know of facts 'critical to a business's core operations or to an important transaction that would affect a company's performance,'" explaining that "[l]ogically, defendants in their positions would be expected to have knowledge of the facts regarding [a core operation of their company] at the time they were making statements about the [operation] or signing off on SEC filings."  *Id*.

As vendor income was core to OfficeMax's operations, it defies logic that defendants were not knowledgeable about the facts regarding its operation, including how OfficeMax accounted for vendor income.  In fact, the Company ***restated 30% of its total operating income*** for its retail division in the 1Q 2004.  ¶24.  Defendants Harad, Milliken, Crumley and Carlile stated in

- 21 -

OfficeMax's SEC filings that they designed, tested and verified the effectiveness of OfficeMax's disclosure controls and procedures, which included those used for vendor accounting. ¶¶52, 55, 60, 62. The very same disclosure controls and procedures the Company later admitted in its 2004 10-K were ineffective during this period and directly caused the Company to materially restate its operating income for the first three quarters of 2004. ¶¶53, 93, 95.

Further, the Complaint alleges that, as the Company's senior management during the class period, defendants: (1) ran OfficeMax as "hands-on" managers with direct involvement in day-to-day operations; (2) were privy to information concerning OfficeMax's retail business, operations, financial statements, financial reporting and disclosure controls; (3) were the primary spokespersons on behalf of the company and hosted quarterly and annual conference calls to announce financial results; and (4) controlled the contents and dissemination of information by the Company, including its SEC filings, reports to shareholders, press releases and other public statements regarding OfficeMax's operations and financial condition. ¶¶15-22.

It is beyond "doubt that [the] individual defendants [] possessed the opportunity to carry out the alleged misrepresentations of [the company's] financial performance to the public since they were officers, directors, and substantial shareholders of [the company] with direct access to and broad control over the Company's financial information." *Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246, 1253 (N.D. Ill. 1997); *see also Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, No. 02 C 5893, 2004 U.S. Dist. LEXIS 4659, at *27-*28 (N.D. Ill. Mar. 22, 2004) (scienter adequately pled where plaintiff alleged defendants were "hands on" managers with access and control over the daily operations of the company).

Here, defendants admittedly had direct access to and control over the Company's financials, which were later restated. There is no doubt defendants had the opportunity to commit this fraud.

### 4. Defendants' Extraordinary Bonuses and Other Compensation Supports an Inference of Scienter

Defendants' executive compensation bonuses, when considered with the totality of plaintiff's allegations, support a strong inference of scienter. *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 661 (8th Cir. 2001) ("the magnitude of [defendant's] compensation package," together with other factors, "provides an unusual, heightened showing of motive to commit fraud"); *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003) (strong inference of scienter because defendants' eligibility for stock options and executive bonuses were based principally on the company's financial performance); *In re Metawave Commc'ns Corp. Sec. Litig.*, 298 F. Supp. 2d 1056, 1071 (W.D. Wash. 2003) ("Scienter can be established even if there were no sales of stock by officers during the class period, if there were other motives for fraud ***such as receiving benefits tied to the company's financial performance***."); *In re Wellcare Mgmt. Group Sec. Litig.*, 964 F. Supp. 632, 639 (N.D.N.Y. 1997) ("[T]he Court will not disregard, as irrelevant, allegations that incentive compensation was affected by the alleged fraudulent conduct.").

The significant bonus and other compensation defendants received during the class period as a result of the success of their fraudulent scheme is motive to commit fraud. Motive entails "'concrete benefits that could be realized by one or more of the false statements and wrongful disclosures alleged.'" *Rehm*, 954 F. Supp. at 1253. Courts have consistently held that motive is sufficiently alleged in cases like this that demonstrate defendants could have secured other concrete benefits by their fraudulent statements and omissions if their scheme was successful. *See Novak v. Kasaks*, 216 F.3d 300, 317 (2d Cir. 2000) ("'Motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged.'"). Motives can be attributed to corporations as a whole, as well as individual company officers. *See Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999).

- 23 -

Here, plaintiff alleges that defendants' motive to engage in the fraud resulted from concrete and specific one-time monetary benefits in the form of significant bonuses, severance and change-in-control payments. Defendant Milliken received a 2004 bonus of approximately $400,000 based on the reported operating results of the office products business. ¶15. Defendant Crumley received a 2004 bonus of approximately $490,000 based in part on OfficeMax's financial performance. ¶16. Defendant Peterson received a 2004 bonus of approximately $1.5 million based in part on OfficeMax's financial performance. ¶17. Defendant Feuer secured a $60 million payoff in severance and other cash payments after the merger.[5] Feuer also received a consulting contract with the Company worth $1 million a year for five years. ¶26. Defendant Harad received a 2004 bonus of $1.54 million (almost double his 2003 bonus) based in part on OfficeMax's financial performance. ¶20. Harad also had 260,300 shares of restricted stock granted to him in 2003. OfficeMax's performance in 2004 satisfied the restrictions and unlocked stock worth approximately $8 million. ¶26. Further, during the class period, Harad obtained a new employment contract with the Company guaranteeing him an incentive and severance package worth over $10 million. *Id.*

To plaintiff's knowledge, none of these individual defendants surrendered any of these substantial financial payouts after the Company was forced to restate its first, second and third quarter 2004 financial results.[6]

Plaintiff also alleges that defendants caused the Company to issue 5.41 million newly-issued shares of OfficeMax common stock to holders of OfficeMax's outstanding 7.5% equity security

---

[5]     Part of this $60 million windfall included Feuer's sale of Boise common stock issued to him in connection with the merger. *See* Boise Cascade's SEC Form S-3, Amendment No. 1, filed December 4, 2003.

[6]     The significant monetary benefits obtained by defendants in 2004, based in large part on the reported financials of the Company, stand in stark contrast to the alleged facts in the one case cited by defendants. *See Hallberg v. Am. Agencies Gen. Agencies, Inc.*, No. 04 C 3245, 2005 U.S. Dist. LEXIS 9663, at *17 (N.D. Ill. Mar. 8, 2005) (defendants' motive to "make a better deal, and thus enjoy more profits").

units on December 16, 2004.  ¶66.  The Company also received $172.5 million is cash as part of this

offering that involved the Company's inflated stock.  *Id.*  The next day, defendants announced the

sale of $1.47 billion in debt by issuing two notes payable in October 2019.  ¶65.  Then, three days

later, on December 20, 2004, defendants disclosed their internal investigation into accounting

irregularities at the Company.  The impeccable timing of defendants' disclosure is highly suspect.

The financial benefits defendants sought through these offerings, while undoubtedly informed of the

vendor accounting issues, is further evidence of their motive to commit fraud.

> **5. Defendants' Evaluation and Certification of OfficeMax's Financial Statements and Disclosure Controls and Procedures Raises a Strong Inference of Scienter**

Defendants argue that plaintiff has failed to allege that any defendant was aware of problems

with the Company's internal disclosure controls and procedures.  This is simply untrue.  It is well

accepted that those who sign SEC filings "accept responsibility" for their contents.  *In re Cabletron*

*Sys.*, 311 F.3d 11, 41 (1st Cir. 2002); *see also Howard v. Everex Sys.*, 228 F.3d 1057, 1061-1062

(9th Cir. 2000).  Defendants Harad (as CEO), Milliken (as CEO), Crumley (as CFO) and Carlile (as

Controller) signed SEC filings and sworn certifications, pursuant to §302 of the Sarbanes-Oxley Act

of 2002, stating they had personally evaluated and certified the effectiveness of the Company's

disclosure controls and procedures during the relevant period.[7]

Defendant Carlile, as Controller and Chief Accounting Officer, signed OfficeMax's 1Q and

2Q 10-Qs for 2004.  ¶¶55, 60.  In each of these 10-Qs, Carlile certified that:

> As of the end of the period covered by this report, the chief executive officer
> and chief financial officer directed and supervised an evaluation of the design and

---

[7]     Section 302 of the Sarbanes-Oxley Act of 2002 also requires a public company's CEO and CFO to
personally certify that the Company's financial statements are accurate.  Harad and Crumley certified the
accuracy of OfficeMax's 1Q 2004 and 2Q 2004 financial statements, while Milliken and Crumley certified
the accuracy of the Company's 3Q 2004 financial statements, all of which the Company later had to restate.

operation of our disclosure controls and procedures pursuant to Rule 13a-15(e) of the Securities Exchange Act of 1934. The evaluation was conducted to determine whether the company's disclosure controls and procedures were effective in bringing material information about the company to the attention of senior management. Based on that evaluation, our chief executive officer and chief financial officer concluded that the company's disclosure controls and procedures are effective in alerting them in a timely manner to material information that the company is required to disclose in its filings with the Securities and Exchange Commission.

Similarly, defendant Crumley, as CFO, signed OfficeMax's 3Q 10-Q for 2004, containing the same certification as above. ¶62.

In the 1Q and 2Q 10-Qs for 2004, defendants Harad and Crumley also personally certified and stated as follows:

1.    I **have reviewed** this quarterly report on Form 10-Q of [the company];

2.    Based on my knowledge, **this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact** necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3.    Based on my knowledge, **the financial statements**, **and other financial information included in this quarterly report, fairly present in all material respects the financial condition**, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4.    The registrant's **other certifying officer and I are responsible for establishing and maintaining disclosure controls** and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

a.    designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be **designed under our supervision**, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

b.    **evaluated the effectiveness** of the registrant's disclosure controls and procedures and presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this quarterly report based on such evaluation; and

c.    disclosed in this quarterly report any change in the registrant's internal control over financial reporting that occurred during the period covered by this quarterly report that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a.      all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.      any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

*See* 10-Q filed 5/7/04, 10-Q filed 8/5/04.  Similarly, defendants Milliken, as CEO, and Crumley, as CFO, signed the above certification in OfficeMax's 3Q 10-Q for 2004.  ¶62.

Despite these sworn certifications, the following quarter OfficeMax filed its Form 10-K for 2004 with the SEC admitting to "material weakness" in its "internal control over financial reporting" in effect since "the end of 2003."  Specifically, OfficeMax admitted:

[M]anagement concluded that as of December 31, 2004, OfficeMax's internal control over financial reporting was not effective due to a material weakness in internal control associated with the control environment of an entity acquired near the end of 2003.  This material weakness resulted from the combination of the following internal control deficiencies that, when aggregated, resulted in there being more than a remote likelihood that a material misstatement of the annual or interim financial statements would not be prevented or detected on a timely basis by management or employees in the normal course of performing their assigned functions:  (i) insufficient policies and procedures to ensure that employees in the merchandising department of the acquired entity acted in accordance with our Code of Conduct, (ii) insufficient policies and procedures regarding the follow-up on communications from vendor(s) regarding disputed claims, including the lack of adequate segregation of duties involving initiation of transactions and dispute resolution, and (iii) inadequately trained personnel within the merchandising and accounting departments.  As a result of the deficiencies, the company overstated operating income in the first quarter of 2004 and understated operating income in the second and third quarters of 2004.  The company has restated each of the aforementioned quarters to properly reflect the appropriate accounting in each period.

¶93.

Defendants Harad, Crumley, Carlile and Milliken had previously signed SEC filings and/or certifications therein attesting to the design and evaluation of the Company's internal disclosure

- 27 -

controls and procedures. Carlile and Crumley had previously assured investors that "[t]he evaluation was conducted to determine whether the company's disclosure controls and procedures were effective in bringing material information about the company to the attention of senior management." *See* 10-Qs filed 5/7/04, 8/5/04 and 11/9/04. Likewise, Harad, Crumley and Milliken had assured investors that they had "evaluated the effectiveness of the registrant's disclosure controls and procedures." ¶¶55, 60, 62. Yet, as admitted in OfficeMax's 2004 10-K, the Company's internal control problems were widespread and had impacted its core retail segment throughout the class period. Because of these deficiencies, the Company's financial statements violated GAAP and later had to be materially restated for the first three quarters of 2004.

Thus, defendants Harad, Crumley, Carlile and Milliken either knowingly lied about their design, evaluation and effective operation of OfficeMax's disclosure controls or they knowingly covered up problems discovered with vendor accounting during the relevant period. These false statements alone support a strong inference of scienter. Even more so when considered in totality with OfficeMax's restatements (¶85), defendants' large performance-based compensation and bonus packages (¶¶26-27), OfficeMax's own admissions and internal investigation (¶¶93, 95), the suspicious timing and departure of three of OfficeMax's senior executives (¶¶63-64, 67, 69), defendants' perfectly timed notes and common stock offerings (¶¶65, 66) and a formal SEC investigation (¶46).[8]

### B. Defendant Feuer's Impeccably Timed Stock Registration Supports an Inference of Scienter

Separately, defendant Feuer puts forth the argument that plaintiff fails to establish motive by the fact that he registered his Boise stock for resale. Feuer claims that courts have consistently found

---

[8] As discussed above, the Complaint sufficiently sets forth the scienter of each of the individual defendants, thus establishing the scienter of OfficeMax. *See Cabletron*, 311 F.3d at 40.

no negative inference from such sales. However, the only thing consistent about these court decisions is they are all distinguishable and that none are Seventh Circuit authority.

As discussed in Section 4 above, Feuer's financial motivation to engage in this fraud totaled almost $60 million. Part of this obscene payoff came in the form of 542,469 shares of Company common stock. ¶26(a). On December 15, 2003, Feuer caused the Company to register all of the shares he received in the acquisition for resale. *Id*.

Feuer's authority misses the mark. Feuer relies on the First Circuit case of *Greebel*, in which the court examined and relied on the context of the sale and noted, ***in dicta***, that the timing of defendants' sale upon leaving the Company did not seem suspicious given the fact that "[n]one of these [defendants] sold at the high points of the stock price" and that once they leave the Company, "they often have a limited period of time to exercise their company stock options." *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 206 (1st. Cir. 1999). Such is not the case here. A mere 6 days after the acquisition by Boise, Feuer caused the Company to register the Boise stock that he just received for resale – at a time when Company stock was selling at a high point, having increased 18% since the announcement of the sale to Boise. ¶¶26, 47. Further, Feuer did not hold expiring stock options. He also entered into a 5 year consulting contract worth $5 million. ¶26. Unlike the defendant in *Greebel*, Feuer was not leaving the Company any time soon as his consulting contract guaranteed his involvement in OfficeMax's operations for years to come.

Feuer's reliance on *Gaylinn* is also unpersuasive. In this Northern District of California case, the court, simply citing to *Greebel*, stated, ***again in dicta***, that an inference of scienter was negated where the defendant who sold all his shares had to do so in order to exercise his stock options within ninety days of his departure or forfeit them. *Gaylinn v. 3Com Corp.*, 185 F. Supp. 2d 1054, 1067 (N.D. Cal. 2000). Again, the facts of this case do not mirror those of defendant Feuer.

Lastly, in *In re First Union Corp. Sec. Litig.*, a Western District of North Carolina case, the court found that a defendant's stock sales did not support an inference of scienter where the stock sales occurred approximately nine months prior to the beginning of the putative class period. 128 F. Supp. 2d 871, 898 (W.D.N.C. 2001). This case is clearly distinguishable because Feuer registered his stock for sale during the class period.

### C. The Complaint Alleges Defendants Harad and Feuer Made Knowingly False Statements and Omissions About OfficeMax's Financials and Deficient Controls

Defendants claim that plaintiff's allegations regarding defendants' various press release statements about OfficeMax amount to mere puffery and are simply "general expressions of satisfaction" and "optimism for the future." In their separate briefs, defendants Feuer and Harad try to isolate certain statements from plaintiff's Complaint and conclude that the allegations against them are based on puffery. Defendants' argument, however, fails to acknowledge the primary allegations against each of these defendants.

Courts have consistently found statements of opinion and other subjective statements actionable under §10(b) if the speaker is aware of undisclosed facts that tend to seriously undermine the statement's accuracy and if the statement, in context, would likely have been important to investors. *See Lindelow*, 2001 U.S. Dist. LEXIS 10301, at *11-*12 (finding that a press release speaking to "matters of opinion and hope" were not protected and that "statements of opinion will be actionable if it is possible defendants 'said things that were so discordant with reality that they would induce a reasonable investor to buy the stock at a higher price that it was worth ex ante'") (quoting *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 746 (7th Cir. 1997)); *In re Next Level Sys. Sec. Litig.*, No. 97 C 7362, 1999 U.S. Dist. LEXIS 5653, at *17 (N.D. Ill. Mar. 31, 1999) (court held that statements "boasting" of the company's "bright future" were actionable, where defendants were aware of significant problems that the company faced). Moreover, supposed puffery cannot be taken out of

context because "if these statements reinforce factual misstatements and therefore contribute to ongoing deception, they may become actionable." *Sears*, 291 F. Supp. 2d at 726.

Harad signed OfficeMax's false financials, personally certified the accuracy of these financials, and stated that he had tested and verified the effectiveness of the Company's disclosure controls and procedures. ¶52, 10-K filed 3/16/05. These were material statements of historical fact that the Company later admitted were false when stated. Harad made specific statements about OfficeMax's operating margins, income and performance of its retail division. ¶47. Harad also chose to make positive comments about the Company's financial condition in its press releases without disclosing these known problems. ¶¶47, 49. Harad's statements about the retail division's operating margins, income and performance were not mere puffery.

On December 1, 2003, Feuer boasted that OfficeMax "sales increased an astounding almost 35 percent over last year." ¶47. Days later, Feuer also claimed that "[s]hareholders of OfficeMax will receive a combination of cash and Boise stock approximating $1.4 billion, which represents a nearly 70 percent increase in the Company's stock price since last year on the same date." ¶50. Feuer made these statements just days prior to and at the time of the shareholder vote on the proposed merger – a controversial merger opposed by major shareholders and leading organizations, like Institutional Shareholder Services. ¶32. Moreover, Feuer signed a letter to shareholders of both companies encouraging them to approve the merger. This letter was part of the Company's registration statement on Form S-4 filed with the SEC on October 29, 2005. ¶19. The Form S-4 was effective until the merger closed on December 9, 2003. When making these positive statements, Feuer omitted material facts known to him about vendor accounting and control problems at OfficeMax that existed in December 2003. ¶50, 10-K filed 3/16/05. This is a historical fact the Company later admitted to.

Defendants cite to *Searls v. Glasser*, *In re Newell Rubbermaid Sec. Litig.*, and *In re Guidant Corp. Sec. Litig.*, as cases that support their puffery claim. In *Searls*, the court found the phrase "recession-resistant" too vague in that it "lacks the requisite specificity to be considered anything but optimistic rhetoric." *Searls v. Glasser*, 64 F.3d 1061, 1066 (7th Cir. 1995). In *Newell*, the court found that phrases such as "an exceptional strategic fit," "attractive to consumers" and "major development" too vague because "[t]hese statements 'contain[] no useful information upon which a reasonable investor would base a decision to invest.'" *In re Newell Rubbermaid Sec. Litig.*, No. 99 C 6853, 2000 U.S Dist. LEXIS 15190, at *20 (N.D. Ill. Oct. 4, 2000) (citing *Searls*, 64 F.3d at 1066). Similarly, in *Guidant*, the court found vague statements such as "a quantum leap in the treatment of AAA" and describing interest in a product as "phenomenal" as non-actionable puffery. These vague statements are classic puffery. *In re Guidant Corp. Sec. Litig.*, No. 1:03-CV-0892-SEB-WTL, 2004 U.S. Dist. LEXIS 22809, at *43 (S.D. Ind. Nov. 8, 2004). However, these statements are incomparable to defendants' false financial statements, material omissions about vendor accounting issues and control problems and positive historical statements concerning the Company's sales, operating margins and income. ¶¶47-53. Defendants' statements are not puffery, because each defendant was aware of contemporaneous facts that either contradicted their actual statements or the omission of which made their half-truths misleading.

Harad and Feuer separately argue that the additional statements attributed to them fail because plaintiff does not allege their statements to be false nor provide a basis for their falsity. Contrary to these defendants' claims, plaintiff has properly alleged the falsity of their statements, particularly in light of the material omissions in such statements. ¶¶53, 56. Plaintiff has enumerated, in detail, the basis for their falsity throughout the Complaint. *See Chu*, 100 F. Supp. at 820-21 (court found that complaint satisfied the PSLRA where it identified certain financial statements as false because they included inflated revenues). Further, a company's overstatement of

revenues in violation of GAAP principles can constitute a false or misleading statement under Section 10(b). *See Sutton v. Bernard*, No. 00 C 6676, 2001 U.S. Dist. LEXIS 11610, at *11-*15 (N.D. Ill. Aug. 6, 2001); *In re First Merchs. Acceptance Corp. Sec. Litig.*, No. 97 C 2715, 1998 U.S. Dist. LEXIS 17760, at *29-*32 (N.D. Ill. Nov. 4, 1998); *Clark v. Tro Learning*, No. 97 C 8683, 1998 U.S. Dist. LEXIS 7989, at *4-*10 (N.D. Ill. May 20, 1998).  Harad's and Feuer's  material omissions were designed to deceive investors and obtain shareholder approval of the merger by hiding the truth about vendor accounting issues and internal control problems at OfficeMax.  The Company later admitted in its 2004 10-K that these material problems existed in late 2003.  ¶93.  *See Tatz v. Nanophase Tech. Corp.*, No. 01 C 8440, 2002 U.S. Dist. LEXIS 19467, at *11-*13 (N.D. Ill. Oct. 9, 2002) (falsity alleged where plaintiff set forth material facts omitted by defendants).

Harad claims his statements were "projections of financial performance," made with a reasonable basis.  As discussed above, Harad's statements are not projections, but purposeful statements made *with knowledge* of unstable management (¶¶37, 63-64), internal control deficiencies (¶53) and improper vendor accounting (¶¶38, 45, 66).  Moreover, Harad signed OfficeMax's false financials, personally certified the accuracy of these financials and stated that he had tested and verified the effectiveness of the Company's disclosure controls and procedures.  ¶¶55, 60.  *See* 10-Qs filed 5/7/04, 8/5/04 and 10-K filed 3/16/05.  These were statements of historical fact that the Company later admitted were false when stated.

Further, neither Harad's nor Feuer's statements are protected by safe harbor under the PSLRA, as none of the statements are "forward-looking," as they claim.  Statements that are knowingly false when made, statements of present or historical fact and forward-looking statements unaccompanied by "meaningful" cautionary language are never entitled to safe harbor protection. *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 729 (7th Cir. 2004), *cert. denied*. __ U.S. __, 125 S. Ct. 1639 (2005), *cert. denied*, ___ U.S. ___, 125 S. Ct. 1642 (2005).  As discussed above, Harad's and

Feuer's statements and omissions were knowingly false when made as they were based on present and historical fact. For instance, Harad certified and attested to the accuracy of the Company's financial statements for the first, second and third quarter of 2004. ¶¶55, 60, 10-K filed 3/16/05. The Company later admitted these statements were materially false at the time issued. ¶93. Similarly, Feuer intentionally omitted material facts concerning OfficeMax's vendor accounting and control problems while he actively sought investor approval of the merger in December 2003. ¶_. Harad's and Feuer's misstatements and omissions were not forwarding-looking and thus cannot be protected under the PSLRA's safe harbor provisions.

### D. The Complaint Alleges Defendant Peterson Engaged in a Scheme to Defraud OfficeMax Investors

Defendant Peterson argues that his position as President of the Company's Retail Division should somehow shield him from liability. Peterson was the most senior executive in charge of the division that produced the false financials and suffered from inadequate disclosure controls and procedures. The OfficeMax employees who worked for Peterson were the same people who fabricated $3.3 million worth of vendor invoices and supporting documentation. If Peterson truly did not know of the pervasive problems in his department, he was beyond reckless in performing his job functions.

Defendant Peterson claims that plaintiff's allegations rest solely on his "generic status as an officer of the company and nothing more." Defendant Gary Peterson's Supplemental Memorandum in Support of the Joint Motion to Dismiss the Consolidated Complaint ("Peterson Mot.") at 1 n.2. As courts in this district have acknowledged, so-called "generic status" as an officer of a company will yield liability where the officer had direct access to or broad control over financial information or was a hands on manager. *Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246, 1253 (N.D. Ill. 1997); *Lawrence E. Jaffe*, 2004 U.S. Dist. LEXIS 4659, at *24-*28. Further, the presumption of awareness of problems at the company is strong where it effects a "core operation." *Selbst*, 2005 U.S. Dist.

LEXIS 23093, at *61. Here, there was nothing generic about Peterson's position at OfficeMax during the class period. Defendant Peterson, as President of Retail Operations, had direct access to and control over the retail operations, including vendor income relating to advertising or product placement within its superstores.

The Complaint sets forth why OfficeMax's retail division was a core operation of OfficeMax. A big part of defendants' merger strategy was to sell the combined Company's manufacturing operations and expand its retail operations. ¶23. Thus, the success and future prospects of the Company's retail operations was a focus of defendants. *Id*. A key characteristic of the retail operations was extremely low operating margins. Operating margins in the retail industry were frequently lower than 3% of sales. *Id*. One important way OfficeMax improved its margins was through the use of vendor credits. *Id*. Because of the relatively low margins, the amount of vendor credits could have a dramatic effect on margins. *Id*. Thus, the amount and timing of vendor credits recorded each quarter was one of the most important business metrics defendants monitored, particularly in the retail division. *Id*.

Moreover, Peterson knew about vendor complaints over OfficeMax's improper use of vendor payments. The complaints were numerous enough that the retail division had to create an internal process to delay answering the complaints for as long as possible. ¶43. Vendor calls were sent to the Accounts Payable department even though they had not calculated the deductions and Accounts Payable was not allowed to forward the vendor calls to those who had calculated the deductions. *Id*. The group who calculated the deductions, the VIPA group, were unresponsive to vendor complaints. *Id*. VIPA, in addition to double dipping, would also pre-date the deductions, or record the deductions as much as two months before OfficeMax had earned them. *Id*. Some vendors were so angry with these practices that they put OfficeMax on credit hold, while others went to OfficeMax's offices. ¶44. Ultimately, vendor complaints and credit issues made it impossible for OfficeMax's

scheme to continue. *Id*. Peterson had direct access and control over the VIPA group and thus had to know of these serious vendor problems.

Defendant Peterson also urges the Court to disregard the timing of his resignation simply because OfficeMax stated that is was "unrelated to OfficeMax's investigation" in a Company press release. Peterson Mot. at 4. This self-serving statement by OfficeMax and Peterson is particularly interesting because no reason is given for why he left the Company at that particular time. The fact that three of the Company's top officers – the CEO, CFO and President of the retail division (Peterson) – "resigned" during the investigation and another CFO right before the Company announced the investigation, legitimately calls into question defendants' statement. The firing of an executive is evidence that problems have existed for some time. *See In re Mercator Software, Inc., Sec. Litig.*, 161 F. Supp. 2d 143, 150 (D. Conn. 2001). Moreover, defendant Peterson's resignation argument is in conflict with the reasonable inferences the Court draws in favor of the plaintiff at this stage.

### E. The Complaint Alleges Defendant Milliken Made Misstatements and Omissions of Material Fact

Defendant Milliken argues he should not be held liable for his execution of OfficeMax's Form 10-Q for 3Q 2004 because "[t]he only alleged erroneous component of the third quarter results is an ***understatement*** of operating income." Defendant Christopher Milliken's Supplemental Memorandum in Support of the Joint Motion to Dismiss the Consolidated Complaint ("Milliken Mot.") at 3. This argument is absolutely false. Defendant Milliken certified the accuracy of the Company's 3Q 2004 10-Q, which contained the Company's financial results for three months ended September 30, 2004 ***and nine months ended September 30, 2004***. *See* 10-Q filed 11/9/04. Thus, Milliken certified both the understatement of operating income from the 3Q 2004 and the 30% ***overstatement*** of operating income from the 1Q of 2004. In fact, Milliken stated the following in the 3Q 2004 10-Q:

1.      *I have reviewed* this quarterly report on Form 10-Q of OfficeMax Incorporated;

2.      Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to [the three months ended September 30, 2004 and *nine months ended September 30, 2004*]

3.      Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the [three months ended September 30, 2004 and *nine months ended September 30, 2004*].

Milliken's statements in the 3Q 2004 10-Q are absolutely false.

Milliken also made false statements about the effectiveness and operation of OfficeMax's internal disclosure controls and procedures in the 3Q 2004 10-Q, as follows:

4.      The registrant's other certifying officer and I [Milliken] are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

        a.      designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

        b.      evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this quarterly report based on such evaluation; . . .

The 3Q 2004 10-Q stated Milliken's conclusion as to the effectiveness of the controls and procedures as follows: "our chief executive officer [Milliken] and chief financial officer concluded that the company's disclosure controls and procedures *are effective* in alerting them in a timely manner to material information that the company is required to disclose in its filings with the Securities and Exchange Commission."  The Company later admitted Milliken's certification was false.  ¶¶71-72, 74.

Milliken also tries to argue that an understatement of income cannot constitute a material misrepresentation. He cites to the case of *Davis* for support. *See* Milliken Mot. at 3. *Davis* simply does not stand for the proposition that understatements of reported financials are not material misrepresentations. If Milliken is correct, why did OfficeMax restate both its 2Q 2004 and 3Q 2004 financial results? Because understating financial results is still a material violation of GAAP (as OfficeMax even admits in its 2004 10-K) and distorts the Company's overall financial picture. *See* Financial Accounting Standards Board Statements of Financial Accounting Concepts Statement No. 2, 96; *Lindelow*, 2001 U.S. Dist. LEXIS 10301, at *3 ("Disclosure required by the securities laws is measured not by the literal truth, but by the material to accurately inform rather than mislead prospective buyers."); *see also Neopharm*, 2003 U.S. Dist. LEXIS 1862, at *11. Milliken's understatement of income for the three months ended September 30, 2004 is just as material and misleading as his net overstatement of income for the nine months ended September 30, 2004.

### F. Plaintiff Has the Requisite Standing and Adequately Pleads Loss Causation Under the Supreme Court's Decision in *Dura* and Seventh Circuit Standards

Defendants argue that plaintiff does not have standing to bring a Rule 10b-5 claim based on statements they made after plaintiff purchased OfficeMax stock. Defendants contend that plaintiff pleads no false statements or omissions prior to its last purchase of OfficeMax stock on February 6, 2004. Defendants are wrong. Wayne County has already been found to have standing and the largest losses (of lead plaintiff movants) under the PSLRA. *See*, *e.g.*, *Hevesi v. Citigroup Inc*., 366 F.3d 70, 82 (2d Cir. 2004) ("because the PSLRA mandates that courts must choose a party who has, among other things, the largest financial stake in the outcome of the case, it is inevitable that, in some cases, the lead plaintiff will not have standing to sue on every claim"); *In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 204 (S.D.N.Y. 2003) ("nothing in the PSLRA requires that the lead plaintiffs have standing to assert all of the claims that may be made on behalf of all of the

potential classes and subclasses of holders of different categories of security at issue in the case"). Moreover, as Court-appointed lead plaintiff, Wayne County must pursue all viable causes of action against all possible defendants under all available legal theories. At best, defendants' argument is premature and should be addressed under FRCP 23 at class certification. *In re Initial Public Offering*, 214 F.R.D. 117, 123 (S.D.N.Y. 2002) ("being a Lead Plaintiff under the PSLRA is not the same as being a Class Representative under Rule 23").

It is well-settled that a plaintiff in a class action can state a claim on behalf of shareholders who made purchases subsequent to the plaintiff's own purchases, so long as the plaintiff has standing. *Danis v. USN Commc'ns, Inc.*, 189 F.R.D. 391, 399 (N.D. Ill. 1999) ("[W]ere the rule otherwise, there could never be a class action in securities fraud cases because a representative plaintiff would potentially be needed for each day of the class period, since on each day the mix of information available to the public would vary."). In the **pre-PSLRA** case of *Roots P'ship*, on which defendants' argument is premised, the Seventh Circuit stated, "post-purchase statements cannot form the basis of [Rule 10(b)] liability, because the statements could not have affected the price at which plaintiff actually purchased." 965 F.2d at 1420. Unlike here, the plaintiff in *Roots* could not state a claim based on any pre-purchase statements, and therefore, the court held that post-purchase statements could not save plaintiff's claim. *Id.* Here, plaintiff has stated a cause of action for itself based on pre-purchase statements.

Defendants' unlawful accounting manipulations of vendor income admittedly began in "end of 2003." ¶93. Defendants admit their own internal investigation "confirmed claims by a vendor to its retail business that certain employees fabricated supporting documentation for approximately $3.3 million in claims **billed to the vendor by OfficeMax during 2003 and 2004**." ¶66. In its 10-K for 2004, the Company admits to "material weakness" in its "internal control over financial reporting" in effect since "near the end of 2003." ¶93. There is no doubt defendants' unlawful

vendor accounting manipulations and material problems with internal controls existed at the Company in 2003.

On October 29, 2003, defendants filed amendment no. 2 to their SEC Form S-4 registration statement describing the details of the proposed merger agreement between OfficeMax and Boise. This registration statement was effective until the shareholders of both companies voted on the proposed merger on December 9, 2003. Defendants Harad, Crumley and Carlile signed the registration statement. This SEC filing also includes a letter to shareholders of both companies signed by defendants Harad and Feuer. In this letter, Harad and Feuer recommend that all shareholders vote in favor of the merger. Neither Harad or Feuer made any disclosure of the then existing problems with vendor accounting and internal controls at OfficeMax. This material omission was never disclosed to shareholders prior to their vote approving the merger.

On January 22, 2004, defendants announced the Company's 4Q 2003 and full year 2003 financial results. ¶51 Defendants stated, "[f]or 17 selling days in fourth quarter 2003, the segment [retail] recorded sales of $283 million, operating income of $6.1 million, and an operating margin of 2.2%." *Id*. Harad also proclaimed that "Boise's sales and income should increase substantially in 2004" and "[w]ith the acquisition of OfficeMax, Boise Office Solutions [the retain division] will post sharply higher sales and operating income in 2004." *Id*. Plaintiff Wayne County then purchased over 61,000 shares of OfficeMax stock between January 27, 2004 and February 6, 2004, after defendants made these statements. Harad's statement about the retail division posting "sharply higher sale and operating income in 2004" was false when made. Harad failed to disclose known problems with OfficeMax's vendor accounting and disclosure controls. These material facts caused OfficeMax to restate its operating income for the first three quarters of 2004.

The fact that the Company did not formally restate its 4Q 2003 financial results is not dispositive on the falsity of those results. OfficeMax stated only that it **_believes_** the vendor

accounting manipulations that occurred in 2003 were not "material" to their results *for the year ended* December 31, 2003. ¶¶71, 72. To date, OfficeMax has not disclosed what impact these vendor accounting manipulations had on their fourth quarter 2003 financial results.

Defendants' argument that plaintiff has failed to plead loss causation with sufficient particularity is equally unavailing. Plaintiff is not required to plead loss causation with a heightened level of particularity at this stage. The Supreme Court's recent decision in *Dura Pharm., Inc. v Broudo*, ___ U.S. ___, 125 S. Ct. 1627, 1634 (2005) establishes that, at the pleading stage, all a plaintiff needs to do is "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." The Supreme Court recognized that this standard is "not meant to impose a great burden upon a plaintiff" and simply requires a plaintiff to provide a short and plain statement under Fed. R. Civ. P. 8(a)(2) setting forth "what the relevant economic loss *might be*" and what the causal connection "might be" between the plaintiff's loss and defendants' misconduct. *Dura*, 125 S. Ct. at 1634. This is consistent with the Seventh Circuit's position before *Dura*, that a plaintiff need only allege "a plausible theory connecting [the] omission to its loss." *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 649 (7th Cir. 1997); *see also Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173, *cert. denied*, ___ U.S. ___, 2005 U.S. LEXIS 7318 (2005) (loss causation adequately alleged where plaintiffs plead "that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security").

Plaintiffs here plead more than what is required. As described above, the Complaint alleges a detailed fraud by defendants that artificially inflated OfficeMax's stock price through material misrepresentations and omissions about the Company's financial results, manipulations of vendor income, and deficient disclosure controls and procedures. Defendants' false statements and omissions had their intended effect and caused OfficeMax stock to trade at artificially inflated levels,

reaching a high of $38.01 per share, during the class period. ¶101. After the truth concerning OfficeMax's accounting manipulations and internal control deficiencies entered the market and became apparent to investors, OfficeMax stock fell as the prior artificial inflation came out of OfficeMax's stock price. ¶102. As a direct result of defendants' admissions and public revelations regarding the truth about OfficeMax's finances and internal control problems, OfficeMax's stock price plummeted 12%, falling from $32.50 on December 17, 2004 to $28.88 per share on January 12, 2004, a 17 day drop of $3.62 per share. ¶70. This drop removed the inflation from OfficeMax's stock price, causing real economic loss to investors who had purchased the stock during the class period. ¶103.

The Complaint adequately sets forth plaintiff's losses and the causal connection between defendants' misrepresentations and omissions and those losses. This is all that is necessary to set forth the loss causation element of plaintiff's claim. *Dura*, 125 S. Ct. at 1634; *Caremark*, 113 F.3d at 649 ("[Plaintiff] pleaded that its injury was caused by its reliance on the very fact which [defendant] misrepresented, and that allegation is sufficient at this early stage of the litigation.").

### G. The Complaint Properly Alleges Control Person Liability

Section 20(a) imposes control person liability for underlying violations of the 1934 Act. 15 U.S.C. §78t(a). To state a claim under §20(a), plaintiffs must allege: (1) a primary violation; (2) each defendants' exercise of general control over the company's operations; and (3) each defendants' "power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised." *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir. 1992); *Zurich Capital Mkts., Inc. v. Coglianese*, 332 F. Supp. 2d 1087, 1110 (N.D. Ill. 2004) (Plaintiffs, however, "need not meet the heightened pleading requirements of the PSLRA to establish control person liability."). Further, "whether a defendant is a 'controlling person' under §20(a) is a question of fact that cannot be determined at the pleading

stage." *Lindelow*, 2001 U.S. Dist. LEXIS 10301, at *28; *Motorola*, 2004 U.S. Dist. LEXIS 18250, at *115. However, the courts have routinely found "control status" where the defendant is a high-level officer or director and signed off on the materially misleading statements. *See, e.g., Wafra Leasing Corp. 1999-A-1 v. Prime Capital Corp.*, 192 F. Supp. 2d 852, 869 (N.D. Ill. 2002) (allegations that vice president of finance was responsible for misrepresentations during relevant time periods adequately set forth control status).

### 1. Plaintiff Adequately Alleges a Primary Violation

Defendants, both collectively and individually, argue that plaintiff has failed to allege a primary violation. However, plaintiff has clearly stated a claim under §10(b) and Rule 10b-5 outlining each of the defendants' false statements and omissions designed to inflate OfficeMax's stock and mislead investors about the true nature of the Company's financial performance. As discussed throughout the Complaint, each defendant engaged in a scheme to inflate OfficeMax's stock price by: (i) deceiving the investing public regarding OfficeMax's prospects and business; (ii) allowing defendants to obtain shareholder approval of Boise's acquisition of OfficeMax, triggering tens of millions of dollars in severance and related payments to themselves; (iii) artificially inflating the prices of OfficeMax's publicly traded securities; (iv) allowing defendants to arrange to sell more than $1.5 billion worth of OfficeMax notes and common stock in late 2004; and (v) allowing the individual defendants to receive large bonuses based in part on OfficeMax's apparent operating performance. *See* ¶28. As further evidence, in June 2005, the SEC issued a formal order of investigation into OfficeMax's shenanigans regarding accounting for vendor income. ¶74.

### 2. Plaintiff Adequately Pleads Control of OfficeMax's Operations by Each Defendant

Plaintiff has sufficiently pled control of OfficeMax operations by the defendants. To survive a motion to dismiss a §20(a) claim, plaintiff need only plead facts supporting a reasonable inference

- 43 -

of control. *See Howell v. Motorola, Inc.,* 337 F. Supp. 2d 1079, 1101 (N.D. Ill. 2004) (court acknowledging its decision declining to dismiss §20(a) claims against defendants because plaintiff had satisfied the liberal pleading requirements of Rule 8(a)). Further, although mere allegations of titles are insufficient to state a claim for control person liability, allegations of both title and responsibilities may be sufficient to establish control. *See Zurich*, 2005 U.S. Dist. LEXIS 16702.

Plaintiff alleges that each defendant controlled OfficeMax by virtue of their high-level positions, ownership rights and decision-making power with regard to the Company's financial affairs. ¶21. Defendants held the highest executive positions at the Company, were responsible for financial reporting, were at the helm of OfficeMax's daily business and were the only individuals empowered with the authority to implement and oversee the Company's internal controls. Each defendants participated in the preparation of OfficeMax's financial releases, signed SEC filings and spoke to investors and analysts about the reported results. ¶¶15-21.

### 3. Plaintiff Has Adequately Alleged Defendants' Power or Ability to Control OfficeMax's Accounting Misconduct

Each individual defendant sought to demonstrate that he could lead the Company successfully and generate the growth expected by the market. The individual defendants, by virtue of their positions, approved and signed the false financial statements filed by OfficeMax with the SEC and disseminated to the investing public.

Defendant Crumley, as CFO, and defendant Carlile, as Controller, both possessed the power and ability to control the Company's financial reporting and communications with the market. Both of these defendants oversaw many of the finance department's internal reports showing OfficeMax's forecasted and actual growth. ¶22.

Defendant Peterson, as President of OfficeMax's Retail Division, possessed the power and ability to control how OfficeMax accounted for vendor income. Defendants Harad and Feuer, while serving as the CEOs and Chairmen of the Board of Directors of Boise and OfficeMax, respectively,

possessed the power and ability to control OfficeMax's financial reporting and communications with the market. *Id.*

### a.    Defendant Milliken

Defendant Milliken, in his capacity as CEO and President, possessed the power and ability to control reporting of financial results and press releases issued by the Company. Defendant Milliken separately argues that plaintiff fails to "detail Milliken's place in the flow of such corporate information." Milliken Mot. at 8 (citing *Feldman v. Motorola*, No. 90 C 5887, 1993 U.S. Dist. LEXIS 14631, at *30 (N.D. Ill. Oct. 18, 1993)). However, *Feldman* also goes on to state that the Seventh "[C]ircuit has explicitly rejected a requirement that the control person actually participate in the transaction." *Id.*

Contrary to Milliken's assertions, plaintiff does not allege liability based merely on his status within OfficeMax, but instead on his involvement in directing OfficeMax's business. In a press release after the sale of OfficeMax to Boise, Milliken boasts about striving to be a "leading provider of office products," with "a relentless focus on our customers," providing "unparalleled . . . experience in service, in product, in time savings, and in value." ¶49. Milliken's own stated goals for OfficeMax necessitated him taking a hands-on approach and being in the "flow of corporate information," thereby allowing him to reach his goal of being a "leading provider of office products." In addition, Milliken signed SEC filings for OfficeMax. ¶¶15, 62. Based on Milliken's status and hands-on direction of OfficeMax, his contentions of inadequate control person allegations are without merit.

### b.    Defendant Feuer

Defendant Feuer relies on *DH2, Inc. v. Athanassiades*, 359 F. Supp. 2d 708 (N.D. Ill. 2005), in support of his position that the Complaint must contain allegations that he had the capability to prevent the alleged misconduct. Feuer Mot. at 5 n.7. However, this reliance is misplaced. *DH2*

does not – nor does the Seventh Circuit, for that matter – mention anything about requiring plaintiffs to allege defendant's capability to prevent misconduct in establishing control person liability. The requirement is that plaintiff allege defendant's "power or ability to control the specific transaction or activity upon which the primary violation was predicated," and not defendant's ability to prevent the alleged violation. *Dean Witter Reynolds*, 974 F.2d at 881.

In the words of defendant Harad:

> OfficeMax co-founder, Chairman, and CEO Michael Feuer deserves recognition for his leadership in building OfficeMax into the nation's third-largest office products retailer . . . His vision and skill helped to create the outstanding business we are acquiring today.

¶49. As Harad acknowledged, Feuer had to possess the power and ability to control OfficeMax in order to make it "the nation's third-largest office products retailer." Feuer's attempt to shirk the limelight and disclaim his role in managing OfficeMax – everything from day-to-day operations as Chairman and CEO to garnering shareholder approval for the sale to Boise – should be disregarded. The same "vision and skill" that allowed Feuer to make OfficeMax a leading retailer is the same "vision and skill" that created and oversaw the accounting misconduct that plaintiff alleges in the Complaint.

Through each of the individual defendants' high-level executive positions at OfficeMax, coupled with their intimate knowledge of the Company's financial affairs, they were able to devise, control and carry out fraudulent accounting schemes intended to deceive investors regarding the true value of the Company's publicly traded securities, while simultaneously enabling them to line their own pockets with bonuses and incentive-based compensation.

## V.     CONCLUSION

For the reasons discussed above, plaintiff has satisfied all applicable pleading standards and defendants' motions to dismiss should be denied. In the event the Court is inclined to grant any part of defendants' motions, plaintiff respectfully requests leave to amend. *Eminence Capital, L.L.C. v.*

*Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (given the PSLRA's "technical and demanding"

pleadings standards, plaintiff should be freely allowed to amend the Complaint).

DATED:  November 2, 2005                    LERACH COUGHLIN STOIA GELLER
                                              RUDMAN & ROBBINS LLP
                                            MARK SOLOMON
                                            WILLIAM J. DOYLE II
                                            UDOKA NWANNA


                                            _____
                                                 */s/ William J. Doyle II*
                                                WILLIAM J. DOYLE II

                                            655 West Broadway, Suite 1900
                                            San Diego, CA  92101
                                            Telephone:  619/231-1058
                                            619/231-7423 (fax)

                                            Lead Counsel for Plaintiff

                                            MILLER FAUCHER AND CAFFERTY LLP
                                            MARVIN A. MILLER
                                            JENNIFER W. SPRENGEL
                                            NYRAN ROSE PEARSON

                                            30 North LaSalle Street, Suite 3200
                                            Chicago, IL  60602
                                            Telephone:  312/782-4880
                                            312/782-4485 (fax)

                                            Liaison Counsel

S:\CasesSD\OfficeMax 05\OMD00025681.doc

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**CERTIFICATE OF SERVICE**


I hereby certify that on November 2, 2005, I caused the following document:

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' OMNIBUS MOTION TO DISMISS THE CONSOLIDATED COMPLAINT AND THE SUPPLEMENTAL MEMORANDUMS BY DEFENDANTS HARAD, CRUMLEY, CARLILE, MILLIKEN, PETERSON AND FEUER**

to be served electronically by ECF on all counsel of record regarding the Civil Case Number 05-C-0236 (Consolidated).



Dated: November 2, 2005                    ___/s Hillary DeMag____
                                           HILLARY DEMAG