# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| DAVID ROTH, on behalf of himself and all others similarly situated, ) ) ) Plaintiff, ) ) v. ) ) OFFICEMAX, INC., et al., ) ) Defendant. ) | Case No. 05 C 236<br><br>Judge Joan B. Gottschall |

## MEMORANDUM OPINION AND ORDER

This case is a purported class action against OfficeMax, Inc. ("OfficeMax"); Christopher Milliken ("Milliken"), the former President, Chief Executive Officer ("CEO"), and director of OfficeMax; Theodore Crumley ("Crumley"), Chief Financial Officer ("CFO") of OfficeMax; Gary Peterson ("Peterson"), the former President of OfficeMax's Retail Division; Thomas Carlile ("Carlile"), Vice President and Controller of OfficeMax; Michael Feuer ("Feuer"), former Chairman and CEO of OfficeMax until it was sold to Boise Cascade Corporation ("Boise"); and George Harad ("Harad"), former CEO and Executive Chairman of the Board of OfficeMax.

On June 9, 2005, this court granted Wayne County Employees' Retirement System's motion to be appointed as the lead plaintiff in this case. The class period alleged in the complaint runs from December 1, 2003 to January 11, 2005. Plaintiffs allege that OfficeMax as a company, and Milliken, Crumley, Peterson, Carlile, Feuer, and Harad as individuals violated Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j, and Securities Exchange Commission Rule 10b-5, 17 C.F.R § 240.10b-5. Plaintiffs also allege that the

1

defendants were "control persons" who are liable under Section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78(t), for OfficeMax's fraudulent acts. Defendants have moved to dismiss both counts for pleading deficiencies under the Private Securities Litigation Reform Act ("PSLRA") and for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). The motion to dismiss is granted without prejudice.

**I.      Background**

In July 2003, Boise Cascade Corporation ("Boise") announced its proposed acquisition of OfficeMax ("old OfficeMax"). The acquisition was approved by the shareholders of both companies on December 9, 2003. In October 2004, Boise sold its forest products assets and renamed itself OfficeMax, Inc. ("OfficeMax" or "the Company").[1]

On December 20, 2004, the Company announced an investigation into "claims by a vendor to its retail business that certain employees acted inappropriately in requesting promotional payments and in falsifying supporting documentation for approximately $3.3 million in claims billed to the vendor by OfficeMax during 2003 and 2004." On January 12, 2005, OfficeMax announced that its fourth quarter 2004 financial results would be delayed pending the outcome of the investigation. Based on the investigation, the Company ultimately restated its financial results for the first three quarters of 2004, finding that net income had been overstated in the first quarter by $7.1 million and understated in the second and third quarters by approximately $1 million in each quarter. The Company has stated that 2003 results were not materially impacted. The Company terminated six employees as a result of the investigation. In

---

[1]For simplicity, the court will refer to the post-acquisition company as "OfficeMax" or "the Company." If the court is referring to pre-acquisition OfficeMax or Boise, it will explicitly say so.

June 2005, the Securities and Exchange Commission issued a formal order of investigation arising from the Company's internal investigation.[2]

**II.      Discussion**

     A.      Count I: Section 10(b) and Rule 10b-5

"Under § 10(b) of the Securities Exchange Act and Rule 10b-5, a plaintiff can obtain damages if she can prove (1) the defendant made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities (5) upon which the plaintiff justifiably relied and (6) that the false statement proximately caused the plaintiff damages." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 595 (7th Cir. 2006) (citing *Caremark, Inc. v. Coram Healthcare Corp.,* 113 F.3d 645, 648 (7th Cir. 1997)).

In *Makor Issues*, the Seventh Circuit clarified the pleading standard for cases under Section 10(b) and Rule 10b-5. The PSLRA requires fact-pleading that "exceeds even the particularity requirement of Federal Rule of Civil Procedure 9(b)." *Id.* at 594. First, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

At the pleading stage, the plaintiff must also plead the materiality of the allegedly false or misleading statements. *Makor Issues*, 437 F.3d at 595. To evaluate the materiality of the alleged misrepresentations, the court must examine "whether, in context, an investor would reasonably

---

[2]The complaint does not allege whether the SEC investigation is complete, and if so, the outcome of the investigation.

rely on the defendant's statement as one reflecting a consequential fact about the company. If the statement amounts to vague aspiration or unspecific puffery, it is not material." *Id.* at 596.

Additionally, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The required state of mind is "an extreme departure from the standards of ordinary care, which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Makor Issues*, 437 F.3d at 600 (quoting *Sunstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977)). Rejecting the Second Circuit "motive and opportunity" test, which had been applied by most courts in this district, the Seventh Circuit held that, in evaluating whether scienter has been adequately pled, the court must "examine all of the allegations in the complaint and then [] decide whether collectively they establish [a strong inference of scienter]. Motive and opportunity may be useful indicators, but nowhere in the statute does it say that they are either necessary or sufficient." *Id.* at 601. The Seventh Circuit held that a complaint would "survive if it alleges facts from which, if true, a reasonable person could infer that the defendant acted with the required intent." *Id.* at 602. The plaintiff is also required to create the strong inference of scienter "with respect to each individual defendant in multiple defendant cases." *Id.* at 603.

### 1. Alleged Actionable Statements

In the section of the complaint titled "Defendants' False and Misleading Statements Issued During the Class Period," plaintiffs identify many statements made by the defendants, including press releases, SEC filings, and news reports. Plaintiffs apparently contend that all statements made by defendants about the Company's financial performance during the class

4

period were misleading. These statements were misleading, plaintiffs argue, because on December 20, 2004, the Company announced an internal investigation into claims by a vendor that employees had improperly requested promotional payments from a vendor and falsified supporting documentation. The Company ultimately restated its financial statement for the first three quarters of 2004, finding that it overstated operating income in the first quarter of 2004 by $7.1 million and understated operating income by $1.1 million in the second quarter of 2004 and by $1.7 million in the third quarter of 2004. The Company did not restate its 2003 financial statements because it found that those financial statements were not materially impacted by the results of the investigation.

After examining all of the alleged statements, the court finds that plaintiffs have not adequately alleged that Feuer made any false statements. Plaintiffs allege that on December 1, 2003, Feuer was interviewed by Bloomberg News and that interview was broadcast. In that interview, Feuer stated that "holiday sales were 'fantastic,' and that 'sales increased an astounding almost 35 percent over last year.'" Consolidated Compaint ¶ 47. Bloomberg reported based on its interview with Feuer that OfficeMax's fourth quarter 2003 sales would exceed its forecast. *Id.* Although in response to the motion to dismiss plaintiffs argue that "defendants knew of and failed to disclose material problems with OfficeMax's accounting for vendor income," the complaint gives no indication that Feuer's statement about holiday sales was false or misleading.

On December 9, 2003, old OfficeMax issued a press release about its merger with Boise. In that press release, Feuer stated, "Shareholders of OfficeMax will receive a combination of cash and Boise stock approximating $1.4 billion, which represents a nearly 70 percent increase

5

in the Company's stock price since last year on the same date." Consolidated Complaint ¶ 50. Again, there is no indication that this statement was false or misleading.

As to Feuer, the failure to allege any basis for these statements being false or misleading is fatal to the Section 10(b) and Rule 10b-5 claim against him. According to the complaint, Feuer left OfficeMax on the date that the acquisition was complete (December 9, 2003). He remained on as a consultant, but nothing in the complaint indicates the role that Feuer played in the Company as a consultant. After his resignation, he did not sign or certify any of the Company's financial statements. Count I as to Feuer is dismissed without prejudice.

Some of the other statements that plaintiffs quote are merely unactionable puffery. For example, when Boise issued its press release on December 9, 2003, Harad and Milliken made positive statements about the acquisition and hopeful statements about the future.[3] Harad made similarly vague, aspirational statements as part of the Company's January 22, 2004 press release announcing fourth quarter 2003 financial results.[4]

---

[3]Harad stated, "The combined office products business will be strategically stronger and better able to deliver compelling value to its customers through all channels and across all segments of the market." He also stated, "OfficeMax co-founder, Chairman, CEO Michael Feuer deserves recognition for his leadership in building OfficeMax into the nation's third-largest office products retailer. His vision and skill helped to create the outstanding business we are acquiring today." In the December 9, 2003 press release, Milliken stated, "In combining our two complementary organizations, we will strive to be the leading provider of office products and services through a relentless focus on our customers. We will succeed by providing our customers with an unparalleled customer experience - in service, in product, in time savings, and in value."

[4]In the January 22, 2004 press release, Harad said, "Boise's sales and income should increase substantially in 2004." He also said, "With the acquisition of OfficeMax, Boise Office Solutions will post sharply higher sales and operating income in 2004. Same-store sales growth should continue to be positive. However, operating margins will be lower in 2004 than in 2003, as we integrate the lower-margin retail business into our operations."

The remaining statements that may be actionable are the Company-issued statements announcing the Company's financial results and the Sarbanes-Oxley certifications stating that the Company had no internal control problems. Plaintiffs have adequately alleged that these statements were false or misleading because the Company restated its financial results for the first three quarters of 2004 and because the Company has stated that it had internal control problems that allowed vendor income to be incorrectly reported. These misstatements are material because they are statements on which an investor would reasonably rely as reflecting consequential facts about the Company, namely, its financial health.

  2. *Scienter*

Having found that plaintiffs have alleged misleading, material statements against all but one of the individual defendants, the court next examines whether plaintiffs have adequately alleged scienter as to each of the remaining individual defendants.[5] In *Makor Issues*, the plaintiff alleged that two corporate executives made false statements about demand for the company's current primary product and the availability of and demand for its new product. 437 F.3d at 596-99. After finding that the plaintiff had alleged misleading, material statements, the Seventh Circuit considered whether the plaintiff had adequately pled that two corporate officers had the requisite scienter. The court found that the plaintiff had adequately pled scienter as to the company's CEO but not as to the company's chairman. *Id.* at 603. As to the CEO, plaintiff alleged that based on information from a confidential source, there were internal company reports that indicated that demand for the company's current product was likely to decline. *Id.*

---

[5]The court need not examine whether plaintiffs have alleged that Feuer had the required scienter because plaintiffs have not alleged any actionable statements by Feuer.

7

According to another confidential source, the CEO "stayed on top of the company's financial health through weekly conversations with his fellow executives." *Id.* Because of the significance of the product and the number of reports indicating declining demand, the court held that the plaintiff had adequately pled scienter as to the CEO. *Id.*

However, the court held that scienter had not been adequately pled as to the chairman. The plaintiffs had alleged generally that he "regularly attended 'town hall meetings' with [the CEO], that he (with [the CEO]) had his 'hands on the pulse,' and that he knew the status of each product." *Id.* at 604. He also sold some of his shares of the company around the time of his statements about the demand for the product. *Id.* The court held that the plaintiffs had not adequately pled scienter. As to his stock trade, the court found that it did not support a strong inference of scienter because the complaint did not allege his past or subsequent trading to determine if this particular stock sale was unusual. *Id.* In addition, the court stated that any inference of the chairman's knowledge was undermined by the fact that the decline in demand for the product was not obvious until after he had made all of his statements. *Id.*

In this case, the allegations of scienter as to the individual defendants are weaker than those against the chairman in *Makor Issues*. Plaintiffs allege that misleading or false statements in reporting vendor income violated Generally Accepted Accounting Principles ("GAAP"). Plaintiffs also allege that the individual defendants all received significant bonuses and other compensation during the class period.[6] These bonuses, plaintiffs argue, gave the defendants the

---

[6]The complaint alleges that Milliken received a bonus of $396,415 for 2004 in addition to his salary of $753,577; Crumley received a bonus of $487,829 for 2004 in addition to his salary of $507,586; Peterson received a bonus of $1,460,188 for 2004 in addition to his salary of $700,962; and Harad received a bonus of $1,540,000 for 2004 in addition to his salary of more than $1,000,000. The complaint does not allege that Carlile received any bonus.

motivation to misrepresent the Company's financial health. Additionally, the defendants all held executive positions within the Company, and Harad, Carlile, Milliken, and Crumley signed Sarbanes-Oxley certifications which were allegedly false or misleading. The complaint includes other general allegations against the defendants:

> The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of OfficeMax's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not to the public, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading.

Consolidated Complaint ¶ 21. These generalized allegations are not supported with any particularized facts. Thus, the court will address only the complaint's particularized allegations of scienter as to each defendant.

### a. Peterson

Peterson was the President of OfficeMax's Retail Division until January 5, 2005, when he resigned.[7] The complaint alleges that the timing of his resignation is "suggestive of [his] involvement in the scheme." Consolidated Complaint ¶ 87. He received a large bonus for 2004. The complaint does not allege that Peterson signed any of the press releases announcing expected financial results or any of the Company's filings. Although plaintiffs also allege that

---

[7]The court notes that Paragraph 17 of the Consolidated Complaint states that Peterson was "terminated" on January 5, 2004. Later in the complaint, it quotes a January 5, 2005 press release stating that Peterson resigned.

Peterson "participated in the falsification of the Company's financial results," Consolidated Complaint ¶ 22, plaintiffs allege nothing other than Peterson's corporate position to support this statement. Finally, the complaint states that because of the low operating margins in the retail business, "OfficeMax management closely monitored the credits offered by various vendors, to determine whether OfficeMax qualified for the credits and to determine when the credits could be recorded." Consolidated Complaint ¶ 23. The complaint fails to allege a particularized basis for "a strong inference" that Peterson acted with the requisite scienter. As to him, Count I is dismissed without prejudice.

b. Carlile

The complaint fares no better as to Carlile. He was the Vice President and Controller of OfficeMax. The complaint alleges that Carlile as Controller was responsible for financial reporting and communication with the market. Carlile as Controller signed the Company's Form 10-K for fourth quarter 2003, and the Company's Form 10-Q for the first two quarters of 2004. The complaint does not allege that he received any bonus for 2004.

While Carlile's position as Controller and his signature on SEC filings indicate that he was involved in the preparation of the Company's financial statements, these allegations do not support a strong inference of scienter. Nothing in the complaint indicates a basis for inferring that he was aware of other employees' actions in improperly recording vendor credits or that this activity was obvious. Because the complaint does not adequately allege scienter as to Carlile, Count I is also dismissed without prejudice as to him.

c. Milliken

At the time that Boise acquired OfficeMax, Milliken was the division president and CEO

of Boise Office Solutions.[8] On November 1, 2004, Milliken was elected as president, CEO, and a director of the Company. On November 9, 2004, Milliken signed the Form 10-Q for the third quarter 2004, which included a certification that he "had personally supervised the evaluation of the design and operation of the Company's disclosure procedures pursuant to Rule 13a-15(e), to ensure that the Company's controls would alert them to material information which would conflict with GAAP and/or require disclosure." Consolidated Complaint ¶ 62.[9] On December 20, 2004, the Company commenced its internal investigation into vendor reporting, and on February 14, 2005, Milliken resigned as president, CEO and director of the Company. Consolidated Complaint ¶ 71. Plaintiffs allege that Milliken received a bonus of $396,415 for 2004 in addition to his salary of $753,577.

Again, these allegations are insufficient to support a strong inference of scienter. The complaint does not indicate a basis for inferring that Milliken was aware of other employees' actions in improperly recording vendor credits or that these employees' improper activities were obvious. Milliken acted as CEO of the Company for less than two months before the internal investigation was announced, and certified the only filing he is alleged to have signed only eight days after he was elected to that position. It is unclear from the complaint what role Milliken might have had in reporting financial information while he was the CEO of Boise Office Solutions. Count I is dismissed without prejudice as to Milliken for failure to adequately allege

---

[8]According to the press releases issued by the Company announcing financial results, Boise Office Solutions included two operating segments, Contract and Retail. The retail segment included the OfficeMax acquisition.

[9]Milliken became CEO of the Company after the Company had announced its third quarter 2004 results on October 19, 2004 but before the Company filed its Form 10-Q on November 9, 2004.

scienter.

### d. Crumley

Crumley acted as CFO from the time of the OfficeMax acquisition until November 11, 2004 when he resigned. After his replacement, Brian Anderson, resigned on January 12, 2005, Crumley returned as CFO on an interim basis. Crumley signed the Form 10-K and Sarbanes-Oxley certifications for the fourth quarter 2003, the Sarbanes-Oxley certifications for first and second quarters of 2004, and the Form 10-Q for the third quarter 2004. He received a bonus of $487,829 for 2004 in addition to his salary of $507,586.

As CFO, Crumley was certainly involved in the preparation of the Company's financial reports and SEC filings. In addition, he signed every filing made during the class period. Nevertheless, there is nothing in the complaint to indicate that he knew of the improper vendor income reporting or that the incorrect reporting was obvious. The motion to dismiss Count I as to Crumley is granted without prejudice.

### e. Harad

The allegations in the complaint are the most extensive as to Harad. He was the Chairman and CEO of Boise at the time of the acquisition of old OfficeMax. In November 2004, Harad stepped down as CEO and became executive chairman of the board of the Company. On February 14, 2005, when Milliken resigned as CEO, Harad was again appointed by the board of directors to serve as CEO on an interim basis.

Harad received a bonus of $1.54 million for 2004 in addition to his salary of more than $1 million. Additionally, the complaint alleges that the sale of the Company's forest products and paper assets satisfied the performance requirements for a large number of shares of restricted

stock that he had received in 2003. The complaint alleges that, in October 2004, Harad also received a new employment agreement that provided he would receive over $10 million in incentives and severance when he stepped down as executive chairman in June 2005.

Harad was quoted in the press releases announcing financial results for fourth quarter 2003[10] and for first quarter 2004.[11] He signed the Form 10-K and Sarbanes-Oxley certifications for the year ending December 31, 2003 and the Sarbanes-Oxley certifications for the first and second quarters of 2004.

In short, Harad was the leader of the Company for the Class Period. He was involved in certifying financial statements and was quoted in press releases to investors. He received significant financial compensation from the Company as a bonus, salary, and severance. Yet, once again, there is nothing in the complaint to suggest that he was aware of other employees' improper recording of vendor income and those employees' fabrication of supporting documentation or that those employees' activities were obvious. The investigation revealed internal control problems, such as insufficient procedures to ensure that employees followed the Company's Code of Conduct and lack of segregation of duties between initiation of transactions and dispute resolution. Nevertheless, it is not clear from the complaint that Harad (or any other

---

[10]In the press release regarding fourth quarter 2003 results, he stated, "Boise's sales and income should increase substantially in 2004." He also stated, "With the acquisition of OfficeMax, Boise Office Solutions will post sharply higher sales and operating income in 2004. Same-store sales growth should continue to be positive. However, operating margins will be lower in 2004 than in 2003, as we integrate the lower-margin retail business into our operations."

[11]In the press release regarding first quarter 2004 results, Harad stated, "For Boise overall, we continue to expect significantly higher sales and income for full year 2002, relative to 2003, both as the result of the acquisition of OfficeMax and strong or improving performance in all of our businesses."

13

defendant) knew of these control problems prior to the investigation or that the problems would have been obvious. Because the complaint does not allege facts that support a strong inference of scienter as to Harad, Count I is dismissed as to him without prejudice.

The pleading requirements of the PLSRA are demanding, and as previously stated, are even more demanding than those of Federal Rule of Civil Procedure 9(b). A defendant in a senior corporate position who is in a position to receive a large financial-results-based bonus may have motivation to present his company in the best financial light. But this describes nearly all corporate executives, and the PLSRA, which was intended to raise the pleading requirements for this type of suit, requires more than merely pleading a defendant's executive position and his resulting financial incentive to overstate corporate income.

Plaintiffs argue they have pled more here because the misleading statements made in the press releases and SEC filings violated GAAP, and because the Company has admitted that it had internal control problems even though some of the defendants certified that it did not in Sarbanes-Oxley certifications. Still, nothing in the complaint supports a strong inference that these defendants had the required state of mind when they made their allegedly false and misleading statements. Count I is dismissed without prejudice.

      B.      <u>Count II: Control Person Liability under Section 20(a)</u>

In Count II, plaintiffs allege that the individual defendants were controlling persons of OfficeMax, and as such, they are liable under Section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78(t), for OfficeMax's fraudulent acts. Claims of control-person liability under Section 20(a) are "derivative claims, and thus are actionable only if plaintiffs adequately allege a primary violation under [Section] 10(b)." *Premier Capital Management, L.L.C. v. Cohen*, No. 02 C

5368, 2003 WL 21960357, at *9 (N.D. Ill. Aug. 15, 2003).

As discussed above, plaintiffs have not adequately alleged a primary violation under Section 10(b). Count II is therefore dismissed without prejudice.

## III.     Conclusion

For the foregoing reasons, the motion to dismiss is granted without prejudice. If plaintiffs seek to file an amended complaint, they should bear in mind that the complaint must allege with particularity facts that give rise to a strong inference that each individual defendant had the required state of mind, that is, "an extreme departure from the standards of ordinary care, which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Makor Issues*, 437 F.3d at 600.[12]

---

[12]Defendants have argued that the lead plaintiff, Wayne County Employees' Retirement System, cannot allege a primary violation of Section 10(b) because it made its last purchase of OfficeMax stock in February 2004, before the first quarter 2004 financial results were announced. The first quarter 2004 results were the only quarter that was negatively restated. The Company has stated that 2003 results were not materially impacted and has not restated its 2003 financial results. Because most (if not all) of the alleged false statements occurred after the lead plaintiff purchased its stock, there is reason for concern that the lead plaintiff may not be able to plead that it justifiably relied on any of defendants' alleged false statements or that the false statements proximately caused its damages. The court need not reach this issue at this time because it has found that the complaint does not adequately allege a cause of action based on the allegations over the entire Class Period.

15

ENTER:


_____/s/_____
Joan B. Gottschall
United States District Judge

Dated: September 12, 2006